# F. GARY HONULIK *v.* TOWN OF GREENWICH ET AL.
## (SC 18046)

Rogers, C. J., and Norcott, Katz, Vertefeuille, Zarella, McLachlan and Beach, Js.

Submitted on briefs May 28—officially released October 13, 2009

*John Wayne Fox,* town attorney, *Fernando F. de Arango,* assistant town attorney, *Sheila A. Huddleston, Laurie A. Sullivan, Robin G. Frederick* and *William J. Kupinse, Jr.,* for the appellants-appellees (named defendant et al.).

*Kathryn Emmett* and *Christine Caulfield,* for the appellee-appellant (plaintiff).

*Kevin M. Greco* filed a brief for the Silver Shield Association as amicus curiae.

*Richard Blumenthal*, attorney general, *Gregory T. D'Auria*, associate attorney general, and *Robert Deichert* and *Jane R. Rosenberg*, assistant attorneys general, filed a brief for the state of Connecticut as amicus curiae.

*Opinion*

ROGERS, C. J. The plaintiff, F. Gary Honulik, has filed a motion requesting that we reconsider the judgment previously rendered in this appeal; see *Honulik* v. *Greenwich*, 290 Conn. 421, 963 A.2d 979 (2009); to determine whether the panel of this court that decided the appeal lacked jurisdiction over it. The appeal was argued on April 15, 2008, and the opinion disposing of it was officially released on February 24, 2009.[1] In his motion, the plaintiff claims that the judgment was rendered without subject matter jurisdiction because Jus-

---

[1] The plaintiff timely filed a motion to vacate, for reconsideration and/or for reconsideration en banc on March 6, 2009. See Practice Book § 71-5. The defendants thereafter filed a joint motion in opposition to the plaintiff's motion. On May 6, 2009, we granted the motion for reconsideration en banc and ordered counsel for the parties to submit supplemental briefs addressing the jurisdictional question raised by the plaintiff's motion. Upon this court's invitation, the attorney general has filed an amicus brief addressing the question raised by the plaintiff's motion.

The plaintiff argues, and we agree, that the issues raised by the motion are matters of substantial public interest warranting en banc consideration. Accordingly, Chief Justice Rogers, Justice McLachlan and Judge Beach have been added to the panel. See General Statutes § 51-207 (a). Justices Palmer and Schaller did not participate in the decision to grant reconsideration, nor did they participate in the resolution of the jurisdictional claim addressed in this opinion. In light of the ultimate conclusion reached herein, however, Justice Schaller then participated in the reconsideration of the merits of the underlying appeal, and Judge Beach did not remain on the panel. A revised opinion on the merits of the appeal is being released simultaneously with the present opinion on the plaintiff's motion. See *Honulik* v. *Greenwich*, 293 Conn. 698, 980 A.2d 880 (2009). The revised opinion supersedes *Honulik* v. *Greenwich*, supra, 290 Conn. 421, which was released on February 24, 2009.

tice Schaller, a member of the panel and the author of the majority opinion, reached the age of seventy, the constitutionally mandated age of retirement,[2] prior to the release of the opinion, thereby rendering him ineligible to continue to deliberate or to otherwise participate in the disposition of the appeal. More specifically, the plaintiff argues that General Statutes § 51-198 (c),[3] which authorizes Supreme Court justices who have reached the mandatory age of retirement to complete work on appeals they heard prior to retiring, is unconstitutional because it contravenes article fifth, § 6, of the constitution of Connecticut, as amended by article eight, § 2, of the amendments.[4] We disagree and, accordingly, deny the relief requested in the motion insofar as it is based on the plaintiff's jurisdictional claim.

Section 51-198 (c) provides in relevant part that "[a] judge of the Supreme Court who has attained the age of seventy years may continue to deliberate and participate in all matters concerning the disposition of any case which the judge heard prior to attaining said age, until such time as the decision in any such case is officially released." This provision was adopted by the legislature in the wake of this court's opinion in *Doyle*

---

[2] Justice Schaller reached the age of seventy on November 23, 2008.

[3] General Statutes § 51-198 (c) provides: "A judge of the Supreme Court who has attained the age of seventy years may continue to deliberate and participate in all matters concerning the disposition of any case which the judge heard prior to attaining said age, until such time as the decision in any such case is officially released. The judge may also participate in the deliberation of a motion for reconsideration in such case if such motion is filed within ten days of the official release of such decision."

[4] Article fifth, § 6, of the constitution of Connecticut, as amended by article eight, § 2, of the amendments provides: "No judge shall be eligible to hold his office after he shall arrive at the age of seventy years, except that a chief justice or judge of the supreme court, a judge of the superior court, or a judge of the court of common pleas, who has attained the age of seventy years and has become a state referee may exercise, as shall be prescribed by law, the powers of the superior court or court of common pleas on matters referred to him as a state referee."

v. *Metropolitan Property & Casualty Ins. Co.*, 252
Conn. 912, 914E, 746 A.2d 1257 (1999), wherein some
members of the court expressed, in dicta,[5] a belief that
Supreme Court justices constitutionally were required
to cease all work on matters pending before them once
they reached the age of seventy.[6] The state constitu-
tional provision at issue, article fifth, § 6, as amended

---

[5] Dicta are "[o]pinions of a [court] which do not embody the resolution
or determination of the specific case before the court [and] [e]xpressions
in [the] court's opinion which go beyond the facts before [the] court and
therefore are individual views of [the] author[s] of [the] opinion and [are]
not binding in subsequent cases as legal precedent." Black's Law Dictionary
(6th Ed. 1990); see also *St. George* v. *Gordon*, 264 Conn. 538, 547 n.10, 825
A.2d 90 (2003), superseded by statute on other grounds as stated in *Flanagan*
v. *Blumenthal*, 100 Conn. App. 255, 260, 917 A.2d 1047 (2007). The per
curiam opinion in *Doyle* was issued in response to a former panel member's
published objection to the court's sua sponte order for en banc consideration
of an already argued but still pending appeal. *Doyle* v. *Metropolitan Prop-
erty & Casualty Ins. Co.*, supra, 252 Conn. 914B; see also Practice Book
§ 70-7 (b). Because the per curiam opinion addressed only issues raised by
that sua sponte order and not the merits of the case as argued by the parties,
it is dicta in its entirety and, therefore, nonbinding.

[6] The opinion in *Doyle* stated, without supporting citation, that "[t]he
notion that one who, by virtue of the constitution is no longer a member
of this court, may not participate in its decisions, is not, however, simply
the view of a majority of this court as currently constituted. It has been the
uniformly held and followed view of this court long before the dissenting
justice or any current member of this court was appointed to it, and that
view has never been questioned before." *Doyle* v. *Metropolitan Property &
Casualty Ins. Co.*, supra, 252 Conn. 914E; see also id. ("this court's decisions,
in cases on which justices reaching the age of seventy have sat, uniformly
have been published before the particular justice's seventieth birthday").
Our current research reveals, however, that the accuracy of this assertion
is suspect. For example, the official reports of this court indicate that Justice
Elisha Carpenter, who was born on January 14, 1824, and turned seventy
on January 14, 1894; see Appendix, 69 Conn. 731–36; remained a member
of the panel on several cases that were heard prior to his seventieth birthday
but not decided until thereafter. See *Bissell* v. *Dickerson*, 64 Conn. 61, 29
A. 226 (1894) (argued January 4, 1894, decided February 19, 1894); *Park
Bros. & Co., Ltd.* v. *Blodgett & Clapp Co.*, 64 Conn. 28, 29 A. 133 (1894)
(argued January 4, 1894, decided February 8, 1894); *Mills* v. *Britton*, 64
Conn. 4, 29 A. 131 (1894) (argued January 3, 1894, decided February 8, 1894);
*Downing* v. *Sullivan*, 64 Conn. 1, 29 A. 132 (1894) (argued January 3, 1894,
decided February 8, 1894).

by article eight, § 2 of the amendments, provides in relevant part that "[n]o judge shall be eligible to hold his office after he shall arrive at the age of seventy years . . . ." The provision is of long-standing pedigree, dating to the constitution of 1818.[7] The plaintiff argues that the legislative authorization for a retired justice to complete work he or she commenced preretirement conflicts with this provision. The resolution of the plaintiff's claim requires us to determine whether a justice who turns seventy and continues to work on appeals on which he or she sat prior to turning seventy, until those appeals are resolved fully, is "hold[ing] his office" within the meaning of article fifth, § 6, of the state constitution.[8]

---

[7] "The constitutions of 1818 (art. [fifth], § 3) and 1955 (art. [fifth], § 8) provided that '[n]o judge or justice of the peace shall be capable of holding his office, after he shall arrive at the age of seventy years.' The constitution of 1965, in article fifth, § 6, retained the same restriction but changed the word 'capable' to 'eligible' and added the [exception allowing for prospective work by state referees] . . . ." *Florida Hill Road Corp.* v. *Commissioner of Agriculture*, 164 Conn. 360, 363, 321 A.2d 856 (1973).

[8] We conclude at the outset that the activities at issue here clearly do not fall within the exception contained in article fifth, § 6, of the state constitution that permits state referees to exercise, as prescribed by law, the powers of the Superior Court on matters that have been referred to them as state referees. See footnote 4 of this opinion. Although a Supreme Court justice, by operation of statute, becomes a state referee upon retirement for the remainder of his or her term in office as a judge; see General Statutes § 52-434 (a) (1); the completion of that justice's pending Supreme Court caseload cannot reasonably be cast as exercising a power of the Superior Court. Moreover, the statutes defining the powers of state referees do not include sitting on cases at the Supreme Court; see General Statutes § 51-50f (granting retired judges acting as state referees, after attaining age seventy, powers of Superior Court on matters referred by that court); General Statutes § 52-434 (a) (1) (authorizing Superior Court to refer civil, nonjury cases to state referees who have been designated judge trial referees by Chief Justice, as well as civil jury cases if parties consent); General Statutes § 52-434 (b) (authorizing Chief Justice to designate state referees as judge trial referees to whom criminal and civil cases and juvenile matters may be referred); General Statutes § 52-434a (a) (giving judge trial referees same powers and jurisdiction as judges of court from which proceedings have been referred); General Statutes § 52-434c (authorizing retired Supreme Court justices and Appellate Court judges who have become state referees to be designated

In considering this question, we are guided by well established principles. This court has a "duty to construe statutes, whenever possible, to avoid constitutional infirmities . . . ." *Denardo* v. *Bergamo*, 272 Conn. 500, 506 n.6, 863 A.2d 686 (2005). Accordingly, we begin with a strong presumption of constitutionality. "[I]n evaluating [a] . . . challenge to the constitutionality of [a] statute, we read the statute narrowly in order to save its constitutionality, rather than broadly in order to destroy it. We will indulge in every presumption in favor of the statute's constitutionality . . . ." (Internal quotation marks omitted.) *State* v. *Indrisano*, 228 Conn. 795, 805, 640 A.2d 986 (1994). Consistent with this presumption, "when called upon to interpret a statute, we will search for an effective and constitutional construction that reasonably accords with the legislature's underlying intent." (Internal quotation marks omitted.) *State* v. *Floyd*, 217 Conn. 73, 79, 584 A.2d 1157 (1991). "It is an extreme act of judicial power to declare a statute unconstitutional. It should be done with great caution and only when the case for invalidity is established beyond a reasonable doubt." *Kerrigan* v. *Commissioner of Public Health*, 289 Conn. 135, 300, 957 A.2d 407 (2008) (*Borden, J.*, concurring). "It is not enough that a statute goes to the verge of constitutional power. We must be able to see clearly that it goes beyond that power. In case of real doubt a law must be sustained." (Internal quotation marks omitted.) *Snyder* v. *Newtown*, 147 Conn. 374, 390, 161 A.2d 770 (1960),

by Chief Justice as eligible to be assigned to Appellate Court panels by Chief Judge of that court); nor do the powers of the Superior Court include deciding Supreme Court cases. See General Statutes § 51-164s; see generally chapter 882 of the General Statutes; see also *Szarwak* v. *Warden*, 167 Conn. 10, 32–33, 355 A.2d 49 (1974) (distinguishing jurisdictions of Supreme Court and Superior Court). Although Superior Court judges may be summoned to sit on panels of the Supreme Court; see General Statutes § 51-207 (b); our jurisprudence counsels that state referees are not Superior Court judges, but rather, are a sui generis type of tribunal. See *Florida Hill Road Corp.* v. *Commissioner of Agriculture*, 164 Conn. 360, 362, 321 A.2d 856 (1973).

appeal dismissed, 365 U.S. 299, 81 S. Ct. 692, 5 L. Ed. 2d 688 (1961). Accordingly, "where a statute reasonably admits of two constructions, one valid and the other invalid on the ground of unconstitutionality, courts should adopt the construction which will uphold the statute even though that construction may not be the most obvious one." *Adams* v. *Rubinow*, 157 Conn. 150, 153, 251 A.2d 49 (1968).

The plaintiff's claim mainly requires us to interpret article fifth, § 6, of the state constitution. "[I]n *State* v. *Geisler*, 222 Conn. 672, 685, 610 A.2d 1225 (1992), we set forth six factors that, to the extent applicable, are to be considered in construing the contours of our state constitution so that we may reach reasoned and principled results as to its meaning.[9] These factors are: (1) the text of the operative constitutional provision; (2) holdings and dicta of this court and the Appellate Court; (3) persuasive and relevant federal precedent; (4) persuasive sister state decisions; (5) the history of the operative constitutional provision, including the historical constitutional setting and the debates of the framers; and (6) contemporary economic and sociological considerations, including relevant public policies.[10] Id.

---

[9] Although we typically employ a *Geisler* analysis to determine whether a provision of our constitution affords broader individual rights than an analogous provision of the United States constitution; see, e.g., *Perricone* v. *Perricone*, 292 Conn. 187, 212–13, 972 A.2d 666 (2009) (freedom of speech); *Kerrigan* v. *Commissioner of Public Health*, supra, 289 Conn. 155–57 (equal protection); we have at times considered the *Geisler* factors in interpreting language in our constitution that does not have a similar federal counterpart. See, e.g., *Moore* v. *Ganim*, 233 Conn. 557, 581, 660 A.2d 742 (1995) (addressing claim of unenumerated state constitutional obligation to provide subsistence benefits to needy citizens). We consider a structured and comprehensive approach to be helpful in either context.

[10] We also strive to achieve a workable, commonsense construction that does not frustrate effective governmental functioning, at least where such is not clearly contraindicated by application of the factors enumerated in *Geisler*. See, e.g., *Palka* v. *Walker*, 124 Conn. 121, 125–26, 198 A. 265 (1938) (construing provision empowering governor to grant reprieves after conviction until end of next session of General Assembly, and no longer, to mean that limitation upon period during which reprieve may operate runs, not

Although, in *Geisler*, we compartmentalized the factors that should be considered in order to stress that a systematic analysis is required, we recognize that they may be inextricably interwoven. . . . [Moreover], not every *Geisler* factor is relevant in all cases." (Internal quotation marks omitted.) *Kerrigan* v. *Commissioner of Public Health*, supra, 289 Conn. 157. Accordingly, our analysis of article fifth, § 6, of the state constitution is informed by those *Geisler* factors that are relevant to the analysis, which are to some degree intertwined.

Because the text of article fifth, § 6, of the state constitution does not elaborate as to what, precisely, constitutes "hold[ing] . . . office," we turn first to our own jurisprudence for guidance in interpreting that phrase. Although this case presents us with the first challenge to the constitutionality of § 51-198 (c), this court, on multiple occasions, has been asked to consider whether a very similar statute, General Statutes § 51-183g, which authorizes postretirement and postresignation actions of Superior Court judges, is constitutionally infirm. Section 51-183g provides: "Any judge of the Superior Court may, after ceasing to hold office as such judge, settle and dispose of all matters relating to appeal cases, as well as any other unfinished matters pertaining to causes theretofore tried by him, as if he were still such judge."

Section 51-183g, in various incarnations whose differences are of no import here, has been part of our statutory law since 1885. See Public Acts 1885, c. VIII. Shortly

from day of conviction, but from time reprieve is issued, because otherwise opportunity to pursue appeal or seek pardon from legislature could be defeated); *State* v. *South Norwalk*, 77 Conn. 257, 263, 265, 58 A. 759 (1904) (interpreting constitutional requirement that bills shall become laws unless governor returns them to legislature within "three days" for reconsideration to mean three days that legislature is in session, not three calendar days, because legislative session is only time in which it is possible to return bills and literal interpretation would infringe governor's prerogatives).

after the provision's passage, its constitutionality was challenged as being "beyond the power of the legislature . . . ."[11] *Johnson* v. *Higgins*, 53 Conn. 236, 237, 1 A. 616 (1885). This court disagreed. In *Johnson*, a trial judge, subsequent to resigning his office,[12] had acted pursuant to § 51-183g by signing a finding and statement of rulings for purposes of appeal. We concluded that the trial judge's action properly was authorized by the new statutory provision. Id. The court emphasized that it was not aware of authority denying the legislature the power to authorize the actions contemplated by the statute, and relied further on the fact "that [s]imilar legislation, and of more embracing scope, has for many years been operative, unchallenged, in reference to the judicial power of justices of the peace."[13] Id.

---

[11] Presumably, the appellant was raising a separation of powers challenge. Article second of the Connecticut constitution provides: "The powers of government shall be divided into three distinct departments, and each of them confided to a separate magistracy, to wit, those which are legislative, to one; those which are executive, to another; and those which are judicial, to another."

[12] There is no indication from the opinion in *Johnson* that the judge had resigned his office due to age.

[13] See, e.g., Public Statute Laws of Connecticut (1833), c. XXVI, § 1 ("in case of the failure to reappoint any justice of the peace, by the General Assembly, all process, suits, matters and business, which shall have been begun or been made returnable to or before such justice of the peace, before the time of the expiration of his office, may be continued and proceeded with, by and before said justice, to final judgment and execution, and be completed in the same way as if the said justice had been re-appointed and continued in office"). When this provision was operative, justices of the peace were constitutional officers having jurisdiction over civil and criminal matters. Conn. Const. (1818), art. V, § 2. When the constitution subsequently was amended to provide for election of justices of the peace, a similar statutory provision was passed to authorize completion of work by those who failed to be reelected. See Public Acts 1851, c. XIV.

The existence of the foregoing provisions provides strong support for the court's conclusion in *Johnson* that the passage of § 51-183g did not offend the principle of separation of powers embodied in our constitution. Specifically, "a practical [contemporaneous] construction of the [constitution] given by the General Assemblies of the years immediately following 1818, in the forms which their legislation assumed . . . furnish[es] substantial aid to [our] interpretation." *Board of Water Commissioners* v. *Curtis*, 87

## The holding of *Johnson* later was extended in *Todd*

Conn. 506, 510, 89 A. 189 (1913). Because many members of those General Assemblies also had been members of the constitutional convention, they were unlikely, when they enacted the legislation concerning justices of the peace, to have misunderstood or wilfully ignored the constitutional mandate that they recently had helped to frame. See id., 510–11. In light of the holding in *Johnson*, which is based on the foregoing rationale, the plaintiff's argument that a statute authorizing limited judicial acts by those who recently have left judicial office derogates the principle of separation of powers is not persuasive.

Additionally, the basic principles underlying the separation of powers doctrine do not support the plaintiff's claim that § 51-198 (c) constitutes a legislative encroachment on judicial powers. "A statute will be declared unconstitutional if it (1) confers on one branch of government the duties which belong exclusively to another branch . . . or (2) if it confers the duties of one branch of government on another branch which duties significantly interfere with the orderly performance of the latter's essential functions." (Citation omitted.) *University of Connecticut Chapter, AAUP* v. *Governor*, 200 Conn. 386, 394–95, 512 A.2d 152 (1986). Thus, "[i]n the context of challenges to statutes whose constitutional infirmity is claimed to flow from impermissible intrusion upon the judicial power, we have refused to find constitutional impropriety in a statute simply because it affects the judicial function . . . . A statute violates the constitutional mandate for a separate judicial magistracy only if it represents an effort by the legislature to exercise a power which lies exclusively under the control of the courts . . . or if it establishes a significant interference with the orderly conduct of the [courts'] judicial functions." (Internal quotation marks omitted.) *State* v. *McCahill*, 261 Conn. 492, 505, 811 A.2d 667 (2002).

Here, § 51-198 (c) does not purport to remove power from the judicial branch, specifically, the Supreme Court, and to confer it upon another branch; see, e.g., *Bridgeport Public Library & Reading Room* v. *Burroughs Home*, 85 Conn. 309, 320–21, 82 A. 582 (1912) (legislative encroachment on courts' jurisdiction over charitable trusts held unconstitutional); or even upon another court, nor does the statute direct judgments to be rendered in any particular manner. Compare *State* v. *McCahill*, supra, 261 Conn. 503–504 (statute prohibiting courts from releasing certain offenders on post-conviction bail held unconstitutional), with *Macy* v. *Cunningham*, 140 Conn. 124, 131–32, 98 A.2d 800 (1953) (statute directing courts whom to appoint as successor trustees held unconstitutional). Rather, it authorizes specific individuals within the judicial branch to exercise particular judicial powers. Cf. *State* v. *Nardini*, 187 Conn. 109, 124, 445 A.2d 304 (1982) (observing, in upholding constitutionality of Sentence Review Act, that "[t]he claim that the separation of powers provisions of the state constitution preclude the legislature from authorizing action by the judicial department which could vacate its [own] judgments is without substance"). That authorization does not encroach upon a judicial prerogative. Cf. Conn. Const., art. V, §§ 2 and

v. *Bradley*, 97 Conn. 563, 117 A. 808 (1922). In that case, it was claimed that, in light of article fifth, § 6, of the state constitution, a trial judge who had ceased to hold office by virtue of turning seventy lacked the power to make a finding for purposes of appeal. Id., 564. Relying on *Johnson*, this court concluded that the precursor to § 51-183g properly authorized the trial judge's act. Id., 566–71. Together, *Johnson* and *Todd* established that the legislature may permit a resigned or retired judge to complete unfinished matters "after ceasing to hold office as such judge"; General Statutes § 51-183g; without offense to the constitution. More specifically, a retired judge, in completing unfinished matters, is not

3 (granting authority to confer judicial power on individuals to executive, legislative branches). Moreover, it cannot seriously be argued that § 51-198 (c) interferes with the orderly performance of this court's essential functions by assigning it additional, nonjudicial duties. Cf. *Norwalk Street Railway Co.'s Appeal*, 69 Conn. 576, 600–603, 37 A. 1080 (1897) (statute conferring on judiciary power to regulate location, construction and operation of street railways, a legislative function, held unconstitutional). To the contrary, as we discuss subsequently in this opinion, it promotes orderly performance by permitting us to exercise our core function in the most efficient manner.

Finally, we reject Justice Katz' assertion that if this court holds that the legislature properly may authorize judicial acts by those who no longer occupy their judicial office, then, by logical extension, the legislature may authorize *anyone* to perform judicial acts. Such legislation—specifically, the provision pertaining to former justices of the peace and, later, the provision applicable to former Superior Court judges—has been part of Connecticut's statutory law for the better part of two centuries, and, in *Johnson*, more than one century ago, this court sustained its constitutionality. *Johnson* v. *Higgins*, supra, 53 Conn. 237. Nevertheless, the legislature never has sought to extend that holding by enacting provisions purporting to confer judicial powers on laypersons. Common to the older statutes and § 51-198 (c) is a legislative grant of authority to an individual who recently held a particular judicial office and, in the case of a recent retiree, one who remains a judicial officer. This court's holdings necessarily are constrained by those circumstances. Cf. *Perry* v. *Perry*, 222 Conn. 799, 815, 611 A.2d 400 (1992) (legislature's conferring to family support magistrates authority to imprison for contempt held constitutional because magistrates constitute highly trained, quasi-judicial authority subject to Code of Judicial Conduct and supervision of Judicial Review Council).

by virtue of those acts holding office as contemplated by article fifth, § 6, of the state constitution.[14]

[14] We disagree with the plaintiff's argument, embraced by both dissents, that, because the actions of the trial judges at issue in *Johnson* and *Todd* were observed to be "rather clerical than judicial"; *Johnson* v. *Higgins*, supra, 53 Conn. 237; see also *Todd* v. *Bradley*, supra, 97 Conn. 567; the holdings of those cases as to the constitutionality of § 51-183g are limited to such circumstances. The language in *Johnson* indicates clearly that the court did not intend to limit its holding to clerical acts performed pursuant to the statute. The decision states specifically: *"Even if it be admitted that the act of the judge in signing the finding on appeal is a judicial act . . . and that the act was done after he had ceased to be such judge, no authority has been brought to our attention denying the legislature the power implied in the law in question."* (Emphasis added.) *Johnson* v. *Higgins*, supra, 237. Additionally, three members of this court recently declined to read *Johnson* so restrictively, relying on its holding to conclude that § 51-183g authorized a retired Superior Court judge to resentence a criminal defendant upon remand of his case following an appeal, plainly a judicial act. See *State* v. *Miranda*, 274 Conn. 727, 744–45, 878 A.2d 1118 (2005) (*Borden, J.,* concurring).

The other authority cited by Justices Katz and Zarella in their dissenting opinions in support of a distinction between clerical and judicial acts is no more compelling. In *Griffing* v. *Danbury*, 41 Conn. 96 (1874), this court held that a Superior Court judge lacked the power to rule on a motion for a new trial, clearly a judicial act, the day after his resignation became effective, and, in *DeLucia* v. *Home Owners' Loan Corp.*, 130 Conn. 467, 473, 35 A.2d 868 (1944), we concluded that a judge of a town court who ceased to hold office after hearing a case was not authorized to grant a motion for extension of time in which to appeal, also a judicial act. When *Griffing* was decided in 1874, however, § 51-183g was yet to be enacted, and in *DeLucia*, we held, preliminarily, that the statute, then codified at General Statutes (1930 Rev.) § 5698, did not apply to town court judges. Id., 471–72. Read together, then, the foregoing cases establish only that, *in the absence of a grant of authority from the legislature*, those no longer holding judicial office may perform only clerical, and not judicial, acts. Indeed, that point was made explicitly in *DeLucia*: "[A]*side from statutory authority* we have held that, as the making of a finding for an appeal is a clerical act, one might properly be made by a judge who, after hearing and deciding a case, has ceased to hold office . . . ." (Emphasis added.) Id., citing *Todd* v. *Bradley*, supra, 97 Conn. 567. Case law from other jurisdictions is in accord. See, e.g., *Goodman Investment, Inc.* v. *Swanston Equipment Co.*, 299 N.W.2d 786 (N.D. 1980) ("general conclusion is that, *absent statutory authorization*, a judge has no authority to perform judicial functions after expiration of his term of office" [emphasis added]); see also *Reimer* v. *Firpo*, 94 Cal. App. 2d 798, 800, 212 P.2d 23 (1949) (when Superior Court judge "became a member of the appellate court, his term as Superior Court judge terminated, and . . . thereafter he had no power, *except where specifically permitted to do so by statute*, to perform any judicial act as a trial

We turn next to relevant extrajurisdictional precedent.[15] The precise question before us rarely has been the subject of judicial opinion. One case directly on point, however, held that legislation authorizing a retired justice to continue to perform judicial duties on temporary assignment did not run afoul of a constitutional mandatory retirement provision barring the "hold[ing]" of judicial office. See *Claremont School District* v. *Governor*, 142 N.H. 737, 738, 712 A.2d 612 (1998) (reh. denied July 31, 1998). Part II, article 78 of the New Hampshire constitution, which is similar to article fifth, § 6, of our state constitution, provides that "[n]o person shall hold the office of judge of any court . . . after he has attained the age of seventy years." Nevertheless, a state statute permits the chief justice of the Supreme Court of New Hampshire to assign justices "who ha[ve] retired from regular active service" to sit on temporary assignment in the event that a regular member of the court is disqualified, and grants such a retired justice,

judge" [emphasis added]); *Olmstead* v. *District Court*, 403 P.2d 442 (Colo. 1965) ("[g]enerally speaking, *except as it may be otherwise provided by law*, a judge's power to exercise judicial functions ceases with the expiration of his term of office" [emphasis added; internal quotation marks omitted]), superseded by statute as stated in *People* v. *Sherrod*, 204 P.3d 466, 470 (Colo. 2009).

In short, then, the foregoing case law establishes that a judge may perform judicial acts *either* (1) when holding office *or* (2) after ceasing to hold office, for a limited time, if authorized by statute. Thus, Justice Katz' characterization of the *Griffing-Johnson-Todd-DeLucia* line of cases as this court "consistently . . . interpret[ing] holding office to mean the exercise of judicial powers" is entirely inapt. We further disagree with Justice Katz' assertion that we implicitly have reasoned that "the very statute that [we declare] constitutional today was wholly unnecessary for the legislature to enact because such acts could be performed irrespective of whether an individual holds office." As we have acknowledged, this court in *Griffing* and *DeLucia* rejected that notion.

[15] Contrary to Justice Zarella's assertion, the discussion that follows clearly is not dedicated to the "nonissue" of whether, "a Supreme Court justice, upon turning seventy, no longer is permitted, by virtue of article fifth, § 6, to hold his or her office," but rather, whether a retired justice, by virtue of performing limited judicial acts, necessarily *is* holding that office.

when so assigned, the powers of an active Supreme Court justice. N.H. Rev. Stat. Ann. § 490:3 (2003).

In *Claremont School District* v. *Governor*, supra, 142 N.H. 738, the defendants challenged the participation in the appeal of a retired justice, over the age of seventy, who had been assigned pursuant to N.H. Rev. Stat. Ann. § 490:3 (1997), and the Supreme Court of New Hampshire rejected that challenge. According to the court, "[a] retired judge assigned to active duty is authorized to exercise the powers of an office while serving on assignment. *He does not by virtue of the assignment, however, hold an office . . . .*" (Emphasis added; internal quotation marks omitted.) Id., 741. The court acknowledged that "the legislature ha[d] no prerogative to invest retired justices over age seventy with the panoply of powers associated with judicial office," but concluded that "it [did] have the constitutional authority to authorize limited temporary assignment of retired justices over age seventy to ensure the adequate and orderly administration of justice." Id., 742.

The decision of the Supreme Court of New Hampshire provides direct support for the notion that temporary performance of duties associated with a judicial office does not equate with holding that office.[16] Other state courts, in addressing claims pertaining to postretire-

---

[16] Similarly, in an advisory decision, the Supreme Judicial Court of Massachusetts opined that proposed legislation recalling retired justices for temporary judicial service would not contravene a proposed constitutional amendment providing that "upon attaining seventy years of age . . . judges shall be retired." *Opinion of the Justices to the Senate*, 362 Mass. 895, 900, 905, 284 N.E.2d 908 (1972). We consider this holding instructive, even though that court noted the different language in article fifth, § 6, of the constitution of Connecticut, namely, the bar against a judge "hold[ing] his office," and concluded that the distinction in the terms used was compelling. Id., 903. The Supreme Judicial Court's reasoning is unclear, however, given that its opinion also acknowledges that " '[r]etire' " means " 'to withdraw from office' and 'to withdraw from active service.' " Id. In short, we see no meaningful distinction between article fifth, § 6, of our state constitution and the provision at issue in *Opinion of the Justices to the Senate*.

ment judicial activity that concededly are distinct from those at issue here and in *Claremont School District*, also have acknowledged the distinction between performance of judicial duties and status as judicial officeholder. See, e.g., *State ex rel. Wilcox* v. *District Court*, 208 Mont. 351, 358, 678 P.2d 209 (1984) ("retired district judge called in [pursuant to provision allowing for temporary assignment of retired judges] does not become a second incumbent in that office, but simply exercises the powers of a district judge on a temporary basis"); *Werlein* v. *Calvert*, 460 S.W.2d 398, 401 (Tex. 1970) ("A retired judge assigned to active duty is authorized to exercise the powers of an office while serving on assignment. He does not by virtue of the assignment, however, hold an office . . . .") (reh. denied December 31, 1970); *Nelson* v. *Miller*, 25 Utah 2d 277, 288, 480 P.2d 467 (1971) ("we see no constitutional conflict between mandatory retirement for age and legislative authorization for calling a judge back into service upon a 'case-to-case' basis").

Aside from the foregoing cases involving judges, additional support exists for the general proposition that simply performing duties associated with an office or position does not necessarily amount to "holding" that office or position.[17] See, e.g., *Smith* v. *Johnson*, 968 F. Sup. 439, 442 (E.D. Ark. 1997) (concluding, for purposes of determining whether right to retreat provision applied, that general services administration employee

---

[17] Connecticut's statutory scheme authorizing cross court participation also is consistent with this notion. A state referee, although exercising the powers of the Superior Court, does not hold the office of Superior Court judge. *Florida Hill Road Corp.* v. *Commissioner of Agriculture*, 164 Conn. 360, 362, 321 A.2d 856 (1973). Moreover, a Superior Court judge, although authorized to sit on a panel of the Supreme Court or the Appellate Court, does not, by virtue of that assignment, hold the office of Supreme Court justice or Appellate Court judge. See General Statutes §§ 51-197c and 51-198 (specifying fixed numbers of judges and justices that constitute, respectively, Appellate Court and Supreme Court).

had not "held" position of custodial inspector, although he had performed duties of position for two six month periods when it was vacant); *Lowell* v. *United States*, 158 F. Sup. 704, 707–708 (Ct. Cl. 1958) (reasoning, for purposes of computing disability pay, that "there is nothing inconsistent about an officer holding or serving in a permanent rank and at the same time performing active duty in a different temporary rank" and concluding that plaintiff "held" only permanent rank); cf. *State ex rel. Nicolai* v. *Nolte*, 352 Mo. 1069, 1075, 180 S.W.2d 740 (1944) (concluding that provision in city charter that vice president of board of aldermen shall "hold" office of president in event of vacancy meant that vice president shall become president during any vacancy, not merely perform duties of president).

Finally, other courts' jurisprudence as to what constitutes an "office" is instructive. In *United States* v. *Hartwell*, 73 U.S. (6 Wall.) 385, 393, 18 L. Ed. 830 (1867), the United States Supreme Court, in interpreting a criminal statute proscribing embezzlement by certain officials, articulated a formula to apply in determining whether a particular position constitutes an "office." According to the Supreme Court, "[a]n office is a public station, or employment, conferred by the appointment of government. The term embraces the ideas of tenure, duration, emolument,[18] and duties." Id. As one commentator has noted, the *Hartwell* formulation is descriptive rather than prescriptive, and contemplates a continuum. J. O'Connor, "The Emoluments Clause: An Anti-Federalist Intruder in a Federalist Constitution," 24 Hofstra L. Rev. 89, 109 (1995). Thus, "a position characterized by substantial tenure, duration, emoluments, and duties is the paradigmatic office; conversely, a position

---

[18] An emolument is defined as "that which is received as a compensation for services, or which is annexed to the possession of office as salary, fees, and perquisites [or] [a]ny perquisite, advantage, profit, or gain arising from the possession of an office." Black's Law Dictionary (6th Ed. 1990).

possessing none of these attributes would reside at the other end of the continuum as clearly a non-office."[19] Id.

Considering the foregoing factors in relation to a retired justice completing his previously commenced caseload pursuant to § 51-198 (c), it appears that the retired justice's role, although embracing a limited judicial function, does not constitute holding the office of an active Supreme Court justice. First, by its very terms, the statutory authorization to act does not purport to make a new appointment, and the justice does not undergo any appointment process upon retirement. Indeed, § 51-198 (c) acknowledges that the justice has reached the age of ineligibility for appointment. Next, the authority conferred is of very limited tenure and duration—a retired justice may participate and deliberate only on pending appeals heard prior to his retirement date and timely motions for reconsideration pertaining to those appeals. Once those few remaining matters have concluded, the retired justice's work for the court is complete. In regard to emoluments, a retired justice, once he reaches the age of seventy, immediately becomes a state referee. Accordingly, he no longer receives the annual salary of a Supreme Court justice; see General Statutes § 51-47; but instead, is paid under the different compensation structure applicable to referees. See General Statutes § 52-434 (f). Additionally, he must vacate his assigned chambers at the Supreme

---

[19] The *Hartwell* formulation has been invoked in myriad contexts. See, e.g., *Kennedy* v. *United States*, 146 F.2d 26, 28 (5th Cir. 1944) (to determine whether case fell within statutory bar to actions brought by officers of United States to recover fees, salary or compensation); *Thompson* v. *Whitefish Bay*, 257 Wis. 151, 159, 42 N.W.2d 462 (1950) (to determine whether municipal ordinance providing for hiring of village attorney conflicted with constitutional provision governing appointment of village officers); see also *In re Advisory Opinion in re Phillips*, 226 N.C. 772, 777, 39 S.E.2d 217 (1946) (to interpret constitutional provision against dual office holding); J. O'Connor, supra, 24 Hofstra L. Rev. 106–109 (discussing use of formula by federal administrations and Congress to determine whether proposed appointments would violate emoluments clause of United States constitution).

Court to make room for his successor, and his law clerks immediately are reassigned to that successor. In other words, he lacks the emoluments of a Supreme Court justice. Finally, a retired justice's duties pursuant to § 51-198 (c) are narrow in scope. The limited acts he is authorized to perform are far outnumbered by those in which he may take no part, for example, hearing oral arguments for cases pending on the current docket, participating in or deliberating on newly argued matters, considering petitions for certification, formulating and approving internal court rules, voting on policy matters and ruling on the myriad motions filed with the court.[20] In sum, because the position of a judge acting pursuant to § 51-198 (c) allows for very limited responsibilities, carries distinct emoluments and is of minimal duration, that judge cannot be said to be "holding" the office of Supreme Court justice.[21]

[20] Because we conclude herein that temporary performance of the actions contemplated by § 51-198 (c) does not amount to holding the office of Supreme Court justice, we reject the plaintiff's argument that the statute provides for an unlawful legislative alteration of a constitutionally set term of judicial office. See, e.g., *Adams* v. *Rubinow*, supra, 157 Conn. 164–66 (public act authorizing chief court administrator to suspend probate judges indefinitely conflicted with constitutional provision of four year terms for those judges because it effectively granted power to remove judge prematurely); *State ex rel. Eberle* v. *Clark*, 87 Conn. 537, 539, 541, 89 A. 172 (1913) (appointment of police court judge by General Assembly for two years from certain date "and until his successor is duly appointed and qualified" conflicted with constitutional provision of two year terms for those judges [internal quotation marks omitted]). In short, if a retired justice temporarily exercising the limited powers authorized by § 51-198 (c) is not, by virtue of that exercise, holding office, it follows that there has been no improper extension of that justice's constitutional term of office. The cited cases clearly are distinguishable in that the statutes at issue provided for *indefinite* suspension or extension, respectively, of the *entirety* of a sitting judge's official duties.

[21] The limited role of a retired justice in completing unfinished Supreme Court matters stands in sharp contrast to the broad range of judicial duties that a state referee may perform prospectively under the enabling statutes, particularly, trying new cases on an ongoing basis, rendering judgments in those cases and exercising all of the powers and jurisdiction of the court from which the cases have been referred. See footnote 8 of this opinion. Because the position of state referee unquestionably constitutes an office,

In regard to history, article fifth, § 6, of the state constitution in its original form; see footnote 7 of this opinion; obviously reflected the judgment of its framers that judges, at least presumptively, were less adept at performing their duties upon reaching what was considered, at the time, to be advanced age. As explained in *Todd* v. *Bradley*, supra, 97 Conn. 569, "[t]he provision rests upon a public belief that there comes a time in the life of a man when it is better for the public interest that he be not charged with the responsibility of continuous and daily work of so complete absorption as the

which a retired justice may hold indefinitely subject only to periodic reappointment, we agree with Justice Zarella that it was necessary to add an exception to the constitutional prohibition against judges over the age of seventy holding office before the statutes granting such broad powers to referees could be enacted. It is clear, however, that a retired justice completing his remaining work at this court is not serving in his capacity as referee, but rather, simultaneously with holding that new office, is performing the limited remaining duties associated with his former office. See *Lowell* v. *United States*, supra, 158 F. Sup. 707–708 (individual may "hold" one permanent rank while performing temporary duty in another).

Thus, the arguments by Justices Katz and Zarella that the powers of the Superior Court do not include working on Supreme Court cases and, therefore, that the legislature may not, consistent with the authority implicit in article fifth, § 6, of the state constitution, confer to state referees the power to perform such duties, are not persuasive. Article fifth, § 6, of the constitution of Connecticut begins with a general prohibition against a judge "hold[ing] . . . office" beyond age seventy, and then provides an exception to that prohibition, which the legislature may effect through appropriate legislation. Because, as we have determined, a retired justice completing his remaining work at this court is not holding the office of Supreme Court justice, it is not necessary for the statute authorizing that work to fall within the strictures of the exception contained in article fifth, § 6. Indeed, as we state explicitly in footnote 8 of this opinion, "the activities [permitted by § 51-198 (c)] clearly do not fall within the exception contained in article fifth, § 6, of the state constitution that permits state referees to exercise, as prescribed by law, the powers of the Superior Court on matters that have been referred to them as state referees." Notably, article fifth, § 6, of the state constitution contains no prohibition against a judge over age seventy performing limited, temporary judicial duties associated with his former office.

high judicial office calls for."[22] Although public sentiment in regard to the limitations of age assuredly has evolved,[23] we think it sufficient to say that the very limited and temporary postretirement duties authorized by § 51-198 (c) do not implicate substantially the concern underlying a constitutionally mandated retirement age. As we have explained, similar provisions for justices of the peace and Superior Court judges, part of our law for the better part of two centuries, have resulted in few challenges and little controversy.

We conclude with economic and sociological considerations and public policy concerns. The desirability for society of permitting retired justices to complete work commenced preretirement scarcely can be questioned. Undoubtedly, it preserves both the integrity and efficiency of this court. The work of a Supreme Court justice often is a lengthy and unpredictable process, and therefore is not easily timed to conclude precisely on a particular date. *Doyle* v. *Metropolitan Property & Casualty Ins. Co.*, supra, 252 Conn. 914A (*Berdon, J.*, dissenting) (noting "the logistical pressures of publishing the majority, concurrences and dissents of all justices who sat on . . . cases [on which a retiring justice sat]"). Construing article fifth, § 6, of the state constitution as the plaintiff contends would require a justice arbitrarily to cease hearing new cases at some point prior to reaching seventy, effectively cutting his or her

[22] At the 1818 constitutional convention, there was no debate on article fifth, § 3, the predecessor to the current article fifth, § 6, of the state constitution. See W. Horton, The Connecticut State Constitution: A Reference Guide (1993) p. 131.

[23] The current language of article fifth, § 6, of the state constitution "derives from the last sentence of [a]rticle [f]ifth, § 3, of the 1818 [c]onstitution, which stated, 'No judge or justice of the peace shall be capable of holding his office, after he shall arrive at the age of seventy years.' This provision was unchanged until 1965, when the present section [allowing for ongoing employment of retired judges as state referees] was adopted." W. Horton, The Connecticut State Constitution: A Reference Guide (1993) p. 131.

term of office short, and without the possibility of a replacement. If a justice must cease all Supreme Court case work on the date of his seventieth birthday, then, by necessity, he is divested of the full authority and responsibility of his office many months before that date. Id., 915 (*McDonald, C. J.*, dissenting) ("[o]ur constitution does not . . . mandate a constitutional age of disqualification at sixty-nine, sixty-nine and one-half or sixty-nine and three-fourths"). Moreover, it is inevitable that in some cases, despite all good faith efforts, misjudgment as to the time required to dispose of an appeal or delay due to unforeseen difficulties will result in uncompleted cases on which retired justices sat, necessitating reassignment and/or reargument of the case or disposition by less than a full panel. In some instances, an evenly divided vote could result. Relitigation of the appeal due to the foregoing would waste judicial time and resources and, ultimately, the economic resources of the state. Conversely, rushed resolution of appeals to avoid these issues could lessen the quality of the deliberative process.[24] It is evident from the limited

---

[24] In *Wolfe* v. *Yudichak*, 153 Vt. 235, 571 A.2d 592 (1989), the Vermont Supreme Court addressed an issue similar to that presented by this case, also in the context of a motion for reargument. The question presented was whether an opinion had been validly issued where the panel included a justice who had been appointed on an interim basis and had resigned before being confirmed and before the opinion was issued. Id., 252. The Vermont Supreme Court stated: "It has long been the practice of this [c]ourt that a justice who resigns or retires from this [c]ourt after hearing a matter may participate fully in consideration of the case thereafter. This practice is grounded in the [c]ourt's inherent judicial and administrative powers as found in the Vermont [c]onstitution, [c]hapter II, § 30. It conflicts neither with the [g]overnor's power to appoint nor with the Senate's power to confirm, and relates strictly and narrowly to the [c]ourt's inherent power to complete in succeeding terms what was begun in earlier ones. . . . *This power is critical to a [c]ourt with such a high caseload that cases sometimes take a year or more for an opinion to be written. The consequence of [the] petitioner's argument is that the most difficult cases presented to this [c]ourt—those on which members of the [c]ourt have differing views—are always at risk of continuous indecision and reargument. We do not believe that we can function effectively to discharge our constitutional responsibilities under such circumstances.*" (Citation omitted; emphasis added.) Id.,

legislative history associated with § 51-198 (c) that these are the problems the statute was intended to prevent.[25]

On the basis of the foregoing analysis, we disagree with the plaintiff's claim that § 51-198 (c) is unconstitutional.[26] We conclude, therefore, that Justice Schaller's continued participation in the underlying appeal after reaching retirement age properly was authorized by

253. Although the Vermont Supreme Court relied on inherent judicial power rather than statutory authorization to determine that the resigned justice's continued participation was lawful, the public policy rationale and considerations underlying the court's decision are equally applicable to Connecticut.

[25] In testifying before the judiciary committee in favor of the bill that would become § 51-198 (c), then Chief Court Administrator Robert C. Leuba explained: "This proposal would allow the Supreme Court justices who have heard cases prior to attaining the age of [seventy] to deliberate and participate in the final disposition of those cases after turning age [seventy].

"As you know, the period of time between argument of a case in the Supreme Court and the final decision on that case can be fairly lengthy. . . .

"Allowing justices who heard a case prior to attaining the age of [seventy] to participate in the decision phase after age [seventy] will allow those justices to work to full capacity as they near the mandatory retirement age." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 1, 2000 Sess., pp. 6–7. In moving for passage of the bill, Representative Paul R. Doyle described it as "an issue of judicial efficiency and judicial branch efficiency"; 43 H.R. Proc., Pt. 15, 2000 Sess., p. 4983; and explained that "[t]he bottom line is here we're dealing with a Justice of the Supreme Court who has cases before him pending prior to his [seventieth] birthday. It's our interpretation to keep it very limited to . . . the cases pending before him before [seventy]. After [seventy], he simply can deal with the few matters that he may have before him and it's really judicial efficiency . . . ." Id., p. 4988.

[26] We note in closing that, even if Justices Katz and Zarella are correct that the legislature is not constitutionally authorized to confer limited judicial power, short of holding office, to recently retired justices, then it necessarily follows that the power to do so remains with the judiciary. Conn. Const., art. V, § 1; see also footnote 19 of Justice Katz' dissenting opinion. In that circumstance, this court, like the Vermont Supreme Court, could effect the same result as the legislature has through § 51-198 (c) by exercising our inherent judicial power, specifically, "to complete in succeeding terms what was begun in earlier ones." Wolfe v. Yudichak, 153 Vt. 235, 253, 571 A.2d 592 (1989). Viewed this way, we still would uphold the constitutionality of § 51-198 (c) as a mere legislative recognition of an existing judicial power rather than an illegal encroachment on such. See State Bar Assn. v. Connecticut Bank & Trust Co., 145 Conn. 222, 231, 140 A.2d 863 (1958).

that statute and did not affect this court's subject matter jurisdiction. Accordingly, the plaintiff's motion for reconsideration is granted but the relief requested therein, that we vacate the earlier judgment in this case for lack of jurisdiction, is denied.

In this opinion NORCOTT, VERTEFEUILLE, McLACHLAN and BEACH, Js., concurred.

KATZ, J., dissenting. Since the adoption of the Connecticut constitution in 1818, judges age seventy and older have been barred from holding judicial office. Conn. Const. (1818), art. V, § 3.[1] From 1818 until 1965, pursuant to that prohibition, judges who had reached the age of seventy years were not permitted to exercise any judicial powers, but, beginning in 1889,[2] could act in a limited capacity as state referees, consistent with that limitation to find facts and recommend rulings to the trial court. *Harbor Construction Corp.* v. *D. V. Frione & Co.*, 158 Conn. 14, 16, 255 A.2d 823 (1969). Then, in 1965, the constitution was amended to permit judges who were not "eligible to hold [their] office" upon reaching the age of seventy years but had chosen to serve as state referees to exercise limited judicial power, including the powers of the Superior Court, in that capacity. Conn. Const. (1965), art. V, § 6. With the adoption of that amendment, article fifth, § 6, now provides in relevant part: "No judge shall be eligible to hold his office after he shall arrive at the age of seventy years, except that a chief justice or judge of the supreme court . . . [or] a judge of the superior court . . . who

---

[1] Article fifth, § 3, of the 1818 constitution of Connecticut, provides in relevant part: "No judge or justice of the peace shall be capable of holding his office, after he shall have arrived to the age of seventy years."

[2] The position or office of state referee appears to have been created in 1889 when retiring Chief Justice John D. Park was appointed a state referee to hear and report factual findings on any case referred to him. *Florida Hill Road Corp.* v. *Commissioner of Agriculture*, 164 Conn. 360, 365, 321 A.2d 856 (1973).

has attained the age of seventy years and has become a state referee may exercise, as shall be prescribed by law, the powers of the superior court . . . on matters referred to him as a state referee."[3] Conn. Const., amend. VIII, § 2.

Notably, that amendment failed to permit such referees to exercise the powers of the Supreme Court in any capacity. In recognition of that limitation, the long established practice of the Supreme Court had been to have justices refrain from hearing cases several months prior to their seventieth birthdays so that their role in any pending cases would be completed before they were no longer constitutionally authorized to act in that judicial capacity. *Doyle* v. *Metropolitan Property & Casualty Ins. Co.*, 252 Conn. 912, 914E–14F, 746 A.2d 125 (2000) ("In order to accomplish that result, the uniform practice has been not to assign justices approaching that age to cases argued less than three or four months before the justice's approaching seventieth birthday, and for the other members of the court to strive to issue the decision before that date. This practice is not . . . merely based on 'logistical pressures' . . . . It is based, instead on article fifth, § 6, of the constitution of Connecticut . . . ." [Citation omitted.]).

In 2000, however, to circumvent that prohibition, the legislature enacted Public Acts 2000, No. 00-191, now codified at General Statutes § 51-198 (c), which provides in relevant part: "A judge of the Supreme Court who has attained the age of seventy years may continue

---

[3] Although article fifth, § 6, of the Connecticut constitution also referred to judges of the Court of Common Pleas and the powers of that court, the Court of Common Pleas was merged into the Superior Court in 1978. Public Acts 1976, No. 76-436, §§ 1, 681; see General Statutes § 51-164s. Therefore, for purposes of clarity and because it is not relevant to the issue in this appeal, I have omitted from this dissenting opinion references to the Court of Common Pleas.

to deliberate and participate in all matters concerning the disposition of any case which the judge heard prior to attaining said age, until such time as the decision in any such case is officially released. . . ." The constitutionality of this act, however, was questioned from its inception, in light of the well established distinction between the powers exercised by a justice of the Supreme Court and the limited powers that may be exercised by a state referee. See Office of Legislative Research, Amended Bill Analysis for Substitute House Bill No. 5130, as amended by House Amendments A and C, comment.[4]

The majority today nonetheless concludes that § 51-198 (c) is constitutional because, in the majority's view, Supreme Court justices age seventy and older may deliberate on and participate in cases that were argued prior to the justices reaching the constitutional age limit without "holding office." In one fell swoop, the majority casts aside more than 100 years of constitutional juris-

---

[4] The office of legislative research expressly recognized the distinction between the powers of the Supreme Court and the Superior Court when it stated in the bill analysis that it submitted to the legislature: "Article [fifth], [§] 6 of Connecticut's [c]onstitution requires that judges retire at age [seventy]. It permits retired Supreme Court justices to sit as state referees and to exercise [powers] of the Superior Court as powers conferred on referees by statute. This bill does not specify that Supreme Court powers [are] include[d] and other statutes do not specifically deal with this issue. Thus, the bill's grant [of] authority to Supreme Court justices to complete work on cases after they [reach] age [seventy] . . . might be challenged on constitutional grounds." Office of Legislative Research, Amended Bill Analysis for Substitute House Bill No. 5130, as amended by House Amendments A and C, comment. The office of legislative research issued a similar warning concerning the original bill that had been proposed prior to amendment, which would have authorized Supreme Court justices who had reached the age of seventy to work on cases that had been *submitted* to them prior to their seventieth birthday: "This bill does not confer Supreme Court powers on referees and other statutes do not specifically deal with this issue. Thus, these provisions dealing with Supreme Court justices are subject to constitutional challenge." Office of Legislative Research, Bill Analysis for Substitute House Bill No. 5130, comment.

prudence to uphold a statute whose constitutionality was questioned from the time of its passage. Indeed, implicit in the majority's reasoning, the very statute that it declares constitutional today was wholly unnecessary for the legislature to enact because such acts could be performed irrespective of whether an individual holds office. Moreover, taking the majority's reasoning to its logical conclusion, because deliberation and participation on a case do not constitute "hold[ing] . . . [judicial] office," *anyone* can exercise judicial power without violating the constitution, including judges age seventy and over, provided that the legislature vests in them statutory authority to exercise judicial powers. Significantly, by permitting the legislature to grant powers belonging to the judiciary to one not constitutionally authorized to exercise them; *Norwalk Street Railway Co.'s Appeal*, 69 Conn. 576, 592, 37 A. 1080 (1897); the majority ignores the mandates of article second of the Connecticut constitution, which confines the powers of the government to "separate magistrac[ies] . . . ." Accordingly, I respectfully dissent.

At the outset, I note that the meaning of § 51-198 (c) is not in dispute, and I agree with the majority that, were this statute constitutional, it would authorize justices of the Supreme Court to continue to deliberate on and participate in cases after their seventieth birthdays as long as those cases had been heard prior to their seventieth birthdays. The central question that needs to be answered, therefore, is not whether the *statute* may be construed in a manner consistent with the constitution; see *Kerrigan* v. *Commissioner of Public Health*, 289 Conn. 135, 155, 957 A.2d 407 (2008) (statutes are presumed constitutional and court has duty to search for construction within constitution unless statute's invalidity is clear); but, rather, whether the *constitution* permits a justice over the age of seventy to engage in the acts authorized by the statute. Because article fifth,

§ 6, of the state constitution bars judges who have reached seventy years of age from being eligible to "hold . . . office," and provides only one exception to that prohibition, namely, that such a judge who has become a state referee "may exercise, as shall be prescribed by law, the powers of the superior court . . . on matters referred to him as a state referee," there are three inquiries this court must resolve: (1) what it means for a judge to "hold . . . office"; (2) whether "the powers of the superior court" include the power to deliberate on and participate in decisions of this court; and (3) if not, to what extent the legislature may "[prescribe] by law" those powers.

The rules of constitutional interpretation are well settled. As a general matter, "[i]n dealing with constitutional provisions we must assume that infinite care was employed to couch in scrupulously fitting language a proposal aimed at establishing or changing the organic law of the state. *Cahill* v. *Leopold*, 141 Conn. 1, 19, 103 A.2d 818 [1954]; 1 Cooley, Constitutional Limitations (8th Ed.) p. 125. Unless there is some clear reason for not doing so, effect must be given to every part of and each word in the constitution." *Stolberg* v. *Caldwell*, 175 Conn. 586, 597–98, 402 A.2d 763 (1978), appeal dismissed sub nom. *Stolberg* v. *Davidson*, 454 U.S. 958, 102 S. Ct. 496, 70 L. Ed. 2d 374 (1981). Moreover, constitutional analysis must be performed contextually, as "each provision of a constitution must be construed in view of its relation to the whole instrument." *McGovern* v. *Mitchell*, 78 Conn. 536, 551, 63 A. 433 (1906). Finally, it is well established that the question of whether a statute falls within the contours of the constitution is a question of law over which this court exercises plenary review. *Kerrigan* v. *Commissioner of Public Health*, supra, 289 Conn. 155.

I turn therefore to the provision at issue and the constitutional backdrop against which it is set. Article

fifth, § 6, had its origins in the Connecticut constitution of 1818 as article fifth, § 3, which provided in relevant part: "No judge . . . shall be capable of holding his office, after he shall have arrived to the age of seventy years." Adopted contemporaneously with article fifth, § 6, were two other constitutional provisions that shape the lens through which we view the present case: article second,[5] which divided the power of the state among three distinct departments, and article fifth, § 1,[6] which divided the power of the judicial department among the constitutional courts established by the constitution and the lesser courts established by the legislature.

As this court explained in *Norwalk Street Railway Co.'s Appeal*, supra, 69 Conn. 586–89, the adoption of the 1818 constitution represented a radical departure from the government that previously had been in existence. In contrast to the earlier establishment, in which the elected General Assembly had been free to exercise the entirety of state power without constraints, the new government was founded upon the principle of separation of powers, which specifies that the sovereign authority of the people is granted to three separate branches of government—legislative, executive and judicial—each of which maintains separate and independent power over its individual sphere of authority. Id., 587, 592–94. The powers granted to each branch

---

[5] The following language in article second of the Connecticut constitution has remained unchanged since its adoption in 1818: "The powers of government shall be divided into three distinct departments, and each of them confided to a separate magistracy, to wit, those which are legislative, to one; those which are executive, to another; and those which are judicial, to another."

[6] Article fifth, § 1, of the Connecticut constitution was adopted in 1818 and originally provided: "The [j]udicial power of the state shall be vested in a Supreme Court of Errors, a Superior Court and such [i]nferior [c]ourts as the General Assembly shall, from time to time, ordain and establish. The powers and jurisdiction of [these] [c]ourts shall be defined by law." This provision subsequently was amended. See footnote 7 of this dissenting opinion.

encompass the full range of its authority over that sphere, except as limited by the constitution, and no branch may invade the powers of another branch. Conn. Const. (1818), art. II; *Norwalk Street Railway Co.'s Appeal,* supra, 587, 592–94. In accordance with this tenet, for more than 100 years, this court consistently has reaffirmed the principle of separation of powers and has held that no branch may usurp powers belonging to another branch for the purposes of exercising the authority of that branch. See, e.g., *State* v. *Clemente,* 166 Conn. 501, 510–11, 513–15, 353 A.2d 723 (1974) (explaining division of power among branches, noting that some incidental overlap of powers is necessary for government to function but stating constitution requires branches to be kept separate in areas where they possess exclusive power).

In the same instrument, the power of the judicial branch similarly was divided. Article fifth, § 1, of the Connecticut constitution divides judicial power among the various constitutional courts—those established directly by the constitution itself—and the lower courts—those that may be established by the legislature. *Adams* v. *Rubinow,* 157 Conn. 150, 155–56, 251 A.2d 49 (1968). Although, at the time of its enactment in 1818, article fifth, § 1, referred only to the Supreme Court of Errors and the Superior Court, it later was amended to reflect the current court structure and currently provides: "The judicial power of the state shall be vested in a supreme court, an appellate court, a superior court, and such lower courts as the general assembly shall, from time to time, ordain and establish. The powers and jurisdiction of these courts shall be defined by law."[7] Conn. Const., amend. XX, § 1. As this

---

[7] Article fifth, § 1, was amended in 1965 to rename the Supreme Court of Errors as the Supreme Court. See Conn. Const. (1965), art. V, § 1; Constitutional Committee Hearings, Resolutions and Rules of the 1965 Connecticut Constitutional Convention (August 24, 1965) pp. 31–32, remarks of former Chief Justice Raymond E. Baldwin. It was amended again in 1982 to establish the Appellate Court as an intermediate appeals court between the Superior

court has explained previously in detail; *Styles* v. *Tyler*, 64 Conn. 432, 445–50, 30 A. 165 (1894); the judicial power exercised by each of these courts is separate and distinct, and only together do they comprise a full and complete adjudicatory system that encompasses the full scope of judicial authority. Id., 449–50; accord *McGovern* v. *Mitchell*, supra, 78 Conn. 547.

With respect to the ability of the legislature to define the "powers and jurisdiction of these courts," this court has held that this power is not unlimited. *Brown* v. *O'Connell*, 36 Conn. 432, 446 (1870). The legislature has no authority to organize courts by virtue of its general legislative power but instead must do so pursuant to a constitutional grant of authority. Id. Accordingly, the legislature may exercise only the limited authority granted therein and must act in accordance with the constitutional scheme set forth in article fifth of the state constitution. Id. It must be underscored that, although the legislature is free to establish lower courts and apportion jurisdiction between those courts and the Superior Court, pursuant to its authority under article fifth, § 1, of the state constitution, the legislature has no authority to alter or impair the essential nature or jurisdiction of any of the courts defined by the constitution. *Walkinshaw* v. *O'Brien*, 130 Conn. 122, 140–42, 32 A.2d 547 (1943); id., 140 ("[n]ot only must any other court the General Assembly creates be an 'inferiour court' but it may not be so constituted as materially to detract from the essential characteristics of the Superior Court as it was then constituted [in 1818]"); accord *State* v. *Clemente*, supra, 166 Conn. 514–15 (discussing independence of judiciary and limitations to legislative actions affecting judicial branch); *Brown* v. *O'Connell*,

and Supreme Courts to alleviate the large caseload then being serviced by the Supreme Court. See 24 H.R. Proc., Pt. 12, 1981 Sess., pp. 3955–56, remarks of Representative Richard D. Tulisano. There was no discussion at that time relevant to the interpretation of article fifth, § 6.

supra, 36 Conn. 446 (noting that legislature must define court system in accordance with constitutional grant of authority). Moreover, although the legislature may make reasonable rules of administration, practice or procedure concerning lower courts, provided that those rules do not significantly interfere with court operations, it has no inherent power to do so with respect to the constitutional courts. *Adams* v. *Rubinow*, supra, 157 Conn. 155–57; accord *State* v. *Clemente*, supra, 507.

## I

With these principles in mind, I turn to the first question we must answer—what it means for a judge to "hold his office" pursuant to article fifth, § 6, of the state constitution. Nowhere does the constitution define the phrase "hold[ing] his office . . . ." Although the prohibition against judges holding office upon reaching the age of seventy has existed since the adoption of the 1818 constitution; see Conn. Const. (1818), art. V, § 3; Conn. Const. (1965), art. V, § 6; there was no discussion as to its meaning at either the constitutional convention of 1818 or 1965. W. Horton, The Connecticut State Constitution: A Reference Guide (1993) p. 131.

Case law following the ratification of the 1818 constitution, however, consistently has interpreted holding office to mean the exercise of judicial powers. Consequently, judges who were ineligible to hold office were prohibited from exercising any judicial power at all. The earliest case on point that my research has uncovered is *Griffing* v. *Danbury*, 41 Conn. 96 (1874), in which this court held that a judge, who had resigned and, therefore, no longer held judicial office, had no power to grant a motion for a new trial in a case that had been tried before him prior to his resignation, even though he had granted the motion two days after his resignation had taken effect. This court later determined, in *Johnson* v. *Higgins*, 53 Conn. 236, 237–38, 1 A. 616 (1885), that

a judge who no longer holds office properly may articulate findings in cases tried to him in which judgment had entered while he still held his office because such acts were merely "clerical" rather than "judicial."[8] The distinction between clerical and judicial acts was clarified further in *Todd* v. *Bradley*, 97 Conn. 563, 567–68, 117 A. 808 (1922). In that case, this court examined a series of cases that had considered whether findings made by judges following the expiration of their term of office were permissible and concluded that "the making of a finding for the purposes of perfecting an appeal, by one whose term of office has ceased, is not a judicial act. . . . Since the making of a finding is not a judicial act, there is no reason why one whose term of office as a judge has expired may not make up the finding for the appeal." (Citations omitted.) Id., 568–69. In accordance with this principle, in 1944, this court dismissed an appeal that had stemmed from a decision made by a judge who no longer held office because the judge's decision constituted a judicial act. *DeLucia* v. *Home Owners' Loan Corp.*, 130 Conn. 467, 471–73, 35 A.2d 868 (1944). In that case, the judge had rendered judgment while he duly held office. Id., 468. The plaintiff subsequently filed a motion for extension of time to file an appeal. Id., 469. The judge, who in the meantime

---

[8] The majority states that this court, in *Johnson* v. *Higgins*, supra, 53 Conn. 237, noted the lack "of authority denying the legislature the power to authorize the actions contemplated by the statute . . . ." Specifically, however, this court stated only that "no authority has been brought to our attention denying the legislature the power implied in the law in question." *Johnson* v. *Higgins*, supra, 237. It seems clear, therefore, that rather than concluding that the legislature was empowered to authorize nonjudicial officers to perform judicial acts, the court merely remarked that no one had questioned that assumption. This interpretation is bolstered by the fact that two sentences later, the court in *Johnson* discussed the grant of authority the legislative power encompassed, and judicial acts were not included: "No substantial reason is given why the legislative power is incompetent to authorize judicial officers, after their term of office, to complete the history of trials had, and to give permanent and official form to facts found during their term of office. Such acts are rather clerical than judicial." Id.

had ceased to hold his office as a judge, granted the motion. Id. Declaring that the judge was without power to do so after he had left office, this court noted: "The granting of an extension requires a determination whether good cause exists as a basis for the exercise of a judicial discretion. . . . Such a determination is clearly a judicial and not a clerical act. . . . [T]he trial judge lacked power to make the order granting the extension and his act in so doing was void."[9] (Citations omitted.) Id., 472–73.

The recurring theme throughout our case law is that, absent a *constitutional* grant of authority, judges may not perform judicial acts following the completion of their term of office but may perform clerical acts in connection with judgments they already have rendered.[10] Clerical acts include articulating factual findings as necessary for an appeal or signing a judgment that already had been rendered by the court prior to the expiration of a judge's term of office. Notably, such

---

[9] Because the trial judge in *DeLucia* was a "town" judge, this court determined that then General Statutes § 5698, now codified at General Statutes § 51-183g, which provided that judges of the Superior Court "or of any city court may, after ceasing to hold office as such judge, settle and dispose of all matters relating to appeal cases . . . as if he were still such judge," did not apply. *DeLucia* v. *Home Owners' Loan Corp.*, supra, 130 Conn. 471–72. As such, the court had no occasion to consider whether such a statute would be constitutional if it did apply. What is significant for purposes of the present case is the court's determination that a judicial act cannot be undertaken by a judge who no longer holds office.

[10] The majority claims, to the contrary, that this line of cases establishes that, in the absence of a *legislative* grant of authority, judicial acts may not be performed by one not holding judicial office. The majority apparently relies on some well of authority that the legislature may draw from without pointing to any constitutional text that would confer such sweeping powers. For the reasons I discuss more fully in part III of this dissenting opinion, this court long ago rejected the concept that in the absence of such language, the legislature has such power. *Norwalk Street Railway Co.'s Appeal*, supra, 69 Conn. 587, 592–94. Therefore, the legislature is not free to confer judicial powers outside the scope of that authorized by the constitution, and as a result, it cannot confer authority to perform judicial acts by statute.

acts take place following the rendering of judgment in a case and, therefore, can have no effect on that judgment. Indeed, an articulation presumes that the judge simply is making express what he or she previously had relied on in rendering that judgment. Practice Book § 66-5; *State* v. *Wilson*, 199 Conn. 417, 434, 513 A.2d 620 (1986) ("[A]n articulation presupposes ambiguity or incompleteness in the legal reasoning of the trial court in reaching its decision. An articulation may be necessary where the trial court fails completely to state any basis for its decision . . . or where the basis, although stated, is unclear." [Citations omitted.]). This interpretation is buttressed by statements made at the 1965 constitutional convention[11] in support of the amendment allowing state referees to exercise limited judicial power, which those speakers understood as a departure from the state referees' previous role as fact finders who only could recommend rulings, which then would be reviewed and accepted or rejected by a sitting judge, without the power to perform any judicial acts. *Harbor Construction Corp.* v. *D. V. Frione & Co.*, supra, 158 Conn. 16; see also *State* v. *Miranda*, 274 Conn. 727, 744, 878 A.2d 1118 (2005) (*Borden, J.*, concurring)

[11] See Proceedings of the Conn. Constitutional Convention (October 15, 1965) p. 764, remarks of Charles S. Tarpinian ("[The amendment] permits the [j]udges of the Superior Court . . . upon their retirement and their appointment as state referees to exercise the powers of the respective courts from which various causes come. At the present time, when a referee enters a recommendation, that is exactly what it is, a recommendation to the particular [c]ourt from which the subject emanated, and thereupon the [c]ourt must accept his recommendation or go on and determine it."); Constitutional Committee Hearings, Resolutions and Rules of the 1965 Connecticut Constitutional Convention (August 24, 1965) p. 35, remarks of former Justice Abraham S. Bordon ("At the present time, a retired judge becomes a [s]tate [r]eferee. . . . A [s]tate [r]eferee has no right or power to enter a judgment after he decides the case. He may only make a recommendation to the Superior or the Common Pleas Court, which recommendation may or may not be adopted . . . . The matter has to then be referred back to the court for the passage of an order that may be important or necessary for the continuance of the case.").

(discussing 1965 constitutional convention and noting that state referees had limited power prior to adoption of article fifth, § 6, of state constitution in 1965).

Significantly, in the Supreme Court, as in any court, judicial power is exercised up to the point when a judgment is rendered. See *McGovern* v. *Mitchell*, supra, 78 Conn. 547 ("[t]he judges of each court in their joint or separate action exercise the power of that court; each, equally with every other, represents in his official action the judicial power of the [s]tate vested in the court of which he is a member"). It is well established that a Supreme Court judgment is rendered on the date it is published in the Connecticut Law Journal. Practice Book § 71-1;[12] *Doyle* v. *Metropolitan Property & Casualty Ins. Co.*, supra, 252 Conn. 914E. Indeed, as every member of this court is well aware, a justice may elect to change his or her vote on any pending case up until the time that the decision is published.[13] Consequently, a justice who deliberates on and participates in a pending case in support of a judgment to be rendered subsequently is performing a judicial act *until* the time the decision is published. Indeed, deliberation and participation in the course of deciding cases constitutes the very essence of judicial action, namely, fulfilling our core function by rendering a decision that disposes of

[12] Practice Book § 71-1 provides in relevant part: "Unless the court otherwise directs, its judgments and orders shall be deemed to have been rendered or made on the date they appear in the Connecticut Law Journal, and the judgments or orders shall be entered as of that date."

[13] The majority's characterization of the duties of a Supreme Court justice acting pursuant to § 51-198 (c) as restricted to "completing unfinished Supreme Court matters" ignores the fact that during the course of writing the majority opinion of the court, panel members can and have undertaken considerable debate on issues that ultimately may be outcome determinative. For example, panel members may change their vote from their original vote after draft majority or dissenting opinions are circulated or after a petition for rehearing has been granted. The majority fails to explain why a judge's vote taken prior to age seventy is sacrosanct while subsequent votes taken to decide a case following age seventy are any less so.

a case. *State* v. *Clemente*, supra, 166 Conn. 509 ("[t]he most basic component of [the judicial] power is the function of rendering judgment in cases before the court"). The fact that a case was *argued* while the justice constitutionally was authorized to exercise judicial powers is of no moment, as the exercise of judicial powers relevant to that case continues following the time he or she is no longer constitutionally permitted to exercise those powers.[14]

The majority maintains that the acts authorized under § 51-198 (c) do not constitute holding office because, in order to "hold . . . office," a judge must be able to exercise the *full* panoply of judicial authority that may be wielded by the officeholder. Therefore, the majority asserts that the deliberation and participation in pending cases may be undertaken without holding office because those actions represent only one limited facet of judicial power. This interpretation is incorrect for three reasons. First, as I previously have discussed, this interpretation is in direct conflict with all of our relevant case law prohibiting the exercise of any judicial power by one who does not hold office. Second, the act of rendering a judgment constitutes the very essence of judicial power, which, as courts from other jurisdictions make clear, may not be exercised in the absence of some constitutional grant of authority.[15] Cf. *Booth* v.

---

[14] Indeed, at the trial court level, General Statutes § 51-183f expressly provides that if a judge becomes ineligible to hold his or her office *during the pendency of a case*, any other judge from the court of which the ineligible judge is a member may continue that judge's caseload. It does not contemplate the rendering of judgment by a judge who no longer holds office.

[15] I am mindful that certain sister states have permitted *retired* judges to serve after attaining the age of mandatory retirement. See, e.g., *Opinion of the Justices to the Senate*, 362 Mass. 895, 284 N.E.2d 908 (1972); *Claremont School District* v. *Governor*, 142 N.H. 737, 712 A.2d 612 (1998); *Werlein* v. *Calvert*, 460 S.W.2d 398 (Tex. 1970). Because of the fact that each state has adopted different constitutional provisions and statutes, and because different terms have different meanings; see *Opinion of the Justices to the Senate*, supra, 903 (noting that distinction between "holding office" and "retiring" was "significant"); it is not possible to extract a uniform theory

*United States*, 291 U.S. 339, 350, 54 S. Ct. 379, 78 L. Ed.

of law that governs the question of whether a judge who exercises judicial power following a constitutionally mandated retirement actually holds office.

For example, the majority relies on a decision by the Vermont Supreme Court holding that it is constitutionally permissible for a judge to continue his or her participation in a case postretirement; see *Wolfe* v. *Yudichak*, 153 Vt. 235, 253, 571 A.2d 592 (1989); but that state's constitution expressly authorizes the chief justice to "appoint retired justices and judges to special assignments as permitted under the rules of the Supreme Court." Vt. Const., c. II, § 35. The majority ignores this significant textual difference both in its constitutional argument and its reliance on this case in its passing reference to the proposition that this court has *inherent* authority to allow judges to participate in cases postretirement. Its inherent authority reasoning suffers from the same defect as its constitutional reasoning, because there is no authority to support the proposition that the court's inherent authority supersedes an express constitutional limitation. Indeed, if this court's inherent authority would allow us to uphold the constitutionality of § 51-198 (c) as a mere legislative recognition of such authority, as the majority contends, the rest of the majority's analysis would be superfluous. Finally, to the extent that the majority also relies on the policy concerns cited in the Vermont case as to whether the court could function effectively in the absence of a rule permitting such continued participation, such concerns cannot overcome an express constitutional limitation and are not borne out by this court's history.

The factually closest case to the issue as presented in the present appeal is *Claremont School District* v. *Governor*, supra, 142 N.H. 742, in which the New Hampshire Supreme Court held that a statute authorizing retired justices over the age of seventy to serve in a temporary capacity on a case-by-case basis was constitutional, despite the fact that the New Hampshire constitution prohibits judges over the age of seventy from holding office. See N.H. Const., pt. II, art. 78 ("[n]o person shall hold the office of judge of any court, or judge of probate, or sheriff of any county, after he has attained the age of seventy years"). In that case, the court held that: (1) the retired justice did not hold a judicial office by virtue of the temporary assignment and, therefore, did not violate part II, article 78 of the New Hampshire constitution; and (2) because the legislature is constitutionally empowered to determine the composition of the courts and facilitate the administration of justice, the temporary assignment of a retired justice for that purpose on a case-by-case basis is within its power. *Claremont School District* v. *Governor*, supra, 741–43. The court did not engage in a textual or historical constitutional analysis to reach its conclusion, but, rather, appeared simply to justify its conclusion with past practice. Therefore, I find its reasoning unpersuasive. Moreover, I note that, to the extent that our legislature wants to facilitate the administration of justice by statutorily authorizing judges over the age of seventy to serve in a limited and temporary

836 (1934) (noting that retired federal judges continue to hold office, otherwise judicial actions performed after retirement would be illegal since they have would have no authority to exercise judicial power); *Johnson v. Board of Control of the Employees' Retirement System*, 740 So. 2d 999, 1012 (Ala. 1999) (holding that retired state judge who is not vested with authority to exercise state power does not hold office); *State ex rel. Racicot v. District Court*, 243 Mont. 379, 402, 794 P.2d 1180 (1990) (noting that constitutional officer may not holdover in office past end of term, absent constitutional authority or empowering statute); *Opinion of the Justices (Marital Masters' Recommendations)*, 155 N.H. 524, 526–27, 924 A.2d 377 (2007) (holding that "marital masters," as nonjudicial officers, may make only recommendations and may not render judgment because only judicial officers have power to render judgment).

Finally, if the majority's view is correct, then the acts of deliberating on and participating in pending cases may, in fact, be performed by anyone, provided that the legislature enacts an enabling statute to vest judicial authority in that person. Despite the majority's attempt to minimize the significance of this court's decision in *Doyle v. Metropolitan Property & Casualty Ins. Co.*, supra, 252 Conn. 914E–14F, however, we stressed in that case that article fifth, § 6, of the state constitution prevented judges who are not constitutionally authorized to hold office from deciding cases. Id. ("The notion that one who, by virtue of the constitution is no longer a member of this court, may not participate in its decisions . . . has been the uniformly held and followed view of this court long before . . . any current member of this court was appointed to it . . . . This practice

capacity, article fifth, § 6, of the Connecticut constitution already provides, by virtue of its grant of authority to state referees, a means by which this can be done, and the legislature must be constrained by those means.

is not . . . based on logistical pressures . . . . It is based, instead, on article fifth, § 6, of the constitution of Connecticut . . . ." [Citations omitted; internal quotation marks omitted.]).

It would appear, then, that the legislature disagreed with this court's interpretation of a constitutional provision and took it upon itself to circumvent that interpretation by statute.[16] This issue, however, was the very one that forced the framers of the 1818 constitution to separate the powers of the state into three distinct

---

[16] Although in his dissent in *Doyle* v. *Metropolitan Property & Casualty Ins. Co.*, supra, 252 Conn. 915, former Chief Justice McDonald expressed concern, echoed by the majority in the present case, that if a justice, who has heard a case before his seventieth birthday, cannot continue to deliberate and decide those cases after his birthday, he will be bereft of any responsibilities in between those dates, that assertion is both specious and demonstrably wrong. As recent history demonstrates, former Chief Justice Peters, former Chief Justice Callahan, and former Justices Berdon, Glass, Shea, Hull and Healey all managed to work on their opinions and opinions by other justices, act on petitions for certification and fulfill other judicial responsibilities during this time interval and get their opinions either published or slipped in accordance with the constitutional mandates. See, e.g., *State* v. *Turner*, 252 Conn. 714, 751 A.2d 372 (2000); *State* v. *Quinet*, 253 Conn. 392, 752 A.2d 490 (2000); *Burke* v. *Fleet National Bank*, 252 Conn. 1, 742 A.2d 293 (1999); *Carr* v. *Bridgewater*, 224 Conn. 44, 616 A.2d 257 (1992); *Cheshire Mortgage Service, Inc.* v. *Montes*, 223 Conn. 80, 612 A.2d 1130 (1992); *Preston* v. *Dept. of Environmental Protection*, 218 Conn. 821, 591 A.2d 421 (1991); *Rostain* v. *Rostain*, 214 Conn. 713, 573 A.2d 710 (1990).

Moreover, despite the majority's repeated attempt to emphasize the temporary and limited nature of this exercise of authority, I note that in at least two recent cases, decisions of this court were issued long after a justice on the panel had reached the age of seventy and no longer constitutionally was eligible to hold office. See, e.g., *Kerrigan* v. *Commissioner of Public Health*, supra, 289 Conn. 135 (issued more than fourteen months after seventieth birthday of Justice David M. Borden, member of panel); *State* v. *DeCaro*, 280 Conn. 456, 908 A.2d 1063 (2006) (following remand for determination in *State* v. *DeCaro*, 252 Conn. 229, 259, 745 A.2d 800 [2000] [*DeCaro I*], in which court had retained jurisdiction over any further appellate proceedings after remand, final decision was rendered by panel that included former Chief Justice McDonald *five years* after he had turned seventy because of earlier participation in *DeCaro I*). It is clear that, despite the majority's characterization, the powers exercised by such retiring justices may be limitless.

departments. *Moore* v. *Ganim*, 233 Conn. 557, 679 n.41, 660 A.2d 742 (1995) (*Berdon, J.*, dissenting) (discussing *Lung's Case*, 1 Conn. 428 [1815], in which defendant appealed to legislature to overturn murder conviction). For the legislature to proclaim by fiat an alternate interpretation of our state constitution is a violation of both the separation of powers doctrine and fundamental principles of judicial review, and such action categorically is beyond the power of the legislature. *Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L. Ed. 60 (1803) ("[i]t is emphatically the province and duty of the judicial department to say what the law is"); accord *State* v. *Clemente*, supra, 166 Conn. 515 ("[When] there was a clear invasion of judicial power by the legislature . . . courts have not hesitated to step in . . . as a duty imposed by the constitution to keep the three great departments of the government separate. Otherwise, acquiescence to a gradual invasion of the judiciary by the legislature would eventually render the former little more than a judicial staff of the legislature."); *Atwood* v. *Buckingham*, 78 Conn. 423, 428, 62 A. 616 (1905) ("[i]t is the province of the legislative department to define rights and prescribe remedies: of the judicial to construe legislative enactments, determine the rights secured thereby, and apply the remedies prescribed").

The determination that judges may not exercise judicial powers without holding office would dispose of this case were it not for the fact that article fifth, § 6, of the state constitution authorizes a judge who has reached the age of seventy and has become a state referee to "exercise, as shall be prescribed by law, the powers of the superior court . . . on matters referred to him [or her] as a state referee." The question that remains to be resolved, therefore, is whether the powers vested in state referees on cases so referred include the power of the Supreme Court and, if not, to what

extent the legislature may prescribe those powers by law.

## II

I turn first to the question of whether the powers vested by the state constitution in state referees on cases referred to them include the power of the Supreme Court.[17] As I have noted previously, the amendment to the constitution in 1965 granted limited judicial power to state referees. See *State* v. *Miranda*, supra, 274 Conn. 744 (*Borden, J.*, concurring); see also footnote 11 of this dissenting opinion. The history surrounding this amendment indicates that this change was proposed because of the burden imposed on both litigants and the judicial system because the state referees had no authority to render a judgment that would dispose of the case and the trial court could reject the referee's recommendation, thereby requiring in essence a second trial. See *Harbor Construction Corp.* v. *D. V. Frione & Co.*, supra, 158 Conn. 16–19 (explaining state referee procedural process in detail); see also footnote 11 of this dissenting opinion. At the 1965 constitutional convention, the discussion centered on whether to grant state referees the authority to exercise the powers of a "trial judge," and no mention was made of the powers of a justice of the Supreme Court. Constitutional Committee Hearings, Resolutions and Rules of the 1965 Con-

[17] The majority's assertion that a justice may act pursuant to § 51-198 (c) because he is neither "hold[ing] . . . office" nor acting as a state referee and therefore is not bound by constitutional restrictions on state referees entirely misses the point that the legislature lacks the power to confer judicial powers outside the boundaries of the constitution. *Brown* v. *O'Connell*, supra, 36 Conn. 446 ("*the General Assembly [has] no power or authority to organize courts, or appoint judges, by virtue of the general legislative power conferred upon [it]*, and that [its] authority to do either is special, and derived from [article fifth] of the constitution alone; and that the judicial power is not conferred by the General Assembly, but vests, by force of the constitution, in the courts, when organized pursuant to the special provisions of that article" [emphasis added]).

necticut Constitutional Convention (August 24, 1965) p. 34, remarks of former Chief Justice Raymond E. Baldwin; see also id., p. 36, remarks of former Justice Abraham S. Bordon ("it would help the load, the congestion, *in the Superior Court* if, for instance, there is an over-abundance of negligence cases, contract cases, and others that can be tried more effectively by a judge than by a [s]tate [r]eferee" [emphasis added]). This distinction is significant.

Although a justice of the Supreme Court is also a judge of the Superior Court; General Statutes § 51-198 (a);[18] the powers exercised by a Supreme Court justice are not the same as those exercised by a Superior Court judge. As I previously have noted, pursuant to article fifth, § 1, of the state constitution, the judicial power is divided among the constitutional courts, whose essential powers and jurisdiction are fixed by the constitution, and the lesser courts, whose powers and jurisdiction are fixed by the legislature, within constitutional limits. *State* v. *Clemente*, supra, 166 Conn. 514–15. With respect to the Supreme Court and the Superior Court, both of whose origins predate the Appellate Court, this court has recognized that the judicial power exercised by each of these courts is separate and distinct. *Styles* v. *Tyler*, supra, 64 Conn. 445–50; accord *McGovern* v. *Mitchell*, supra, 78 Conn. 547. Specifically, the Supreme Court has authority as the court of last resort for errors in law, while the Superior Court holds both unlimited jurisdiction over all issues not consigned to the lower courts and jurisdiction as the court of last resort for issues of fact. *Styles* v. *Tyler*, supra, 450; *Dudley* v. *Deming*, 34 Conn. 169, 174 (1867). The General Statutes implicitly support this interpretation, as they indicate that, when judges sit by designation on a different court,

[18] General Statutes § 51-198 (a) provides: "The Supreme Court shall consist of one Chief Justice and six associate judges, who shall, at the time of their appointment, also be appointed judges of the Superior Court."

they exercise the power of that court, not their original court. See, e.g., General Statutes § 51-207 (b) (authorizing Superior Court judges to sit by designation on Supreme Court when needed and "attend and act as judges of the Supreme Court"); General Statutes § 51-197c (d) (authorizing Superior Court judges to serve on Appellate Court); *Kerin* v. *Stangle*, 209 Conn. 260, 264, 550 A.2d 1069 (1988) ("[w]hen entertaining an appeal from an order or decree of a Probate Court, the Superior Court takes the place of and sits as the court of probate").

This court has explained that the distinction between the Superior Court and the Supreme Court "expressed the conviction of the people that a jurisdiction of mixed law and fact vested in any court of last resort, exercising a supreme and uncontrolled power, was inconsistent with a sound system of jurisprudence and was dangerous to the administration of justice . . . ." *Styles* v. *Tyler*, supra, 64 Conn. 451. Indeed, precisely because of these distinct spheres of power, the office of legislative research warned the legislature that the statute authorizing judges to continue work on pending cases after the age of seventy raised serious constitutional questions. It is clear, therefore, that the judicial powers vested in the Superior Court and the Supreme Court never were intended to be coincident and that the authorization in article fifth, § 6, of the state constitution for state referees to exercise powers of the Superior Court does not include the power of the Supreme Court.

### III

Finally, I turn to the question of whether the phrase "as shall be prescribed by law" included in article fifth, § 6, of the state constitution gives the legislature license to expand the scope of the powers of the Superior Court and allow state referees to exercise the powers of the Supreme Court. Although early cases had held that the only constitutional limits on the General Assembly's

authority were those limitations expressly stated in the state and federal constitutions and that it even could exercise powers of the other branches as necessary for the good of the people when not so limited; see, e.g., *Starr* v. *Pease*, 8 Conn. 540, 546–47 (1831); that doctrine was firmly repudiated in the latter half of the nineteenth century. *Norwalk Street Railway Co.'s Appeal*, supra, 69 Conn. 591–93. Since that time, this court consistently has reaffirmed the principle that the constitution represents a grant of sovereign authority from the people to separate and distinct branches of government, and the legislature is not free to act beyond either the strictures of that grant of authority or the constitution.[19] It is now

---

[19] See *Norwalk Street Railway Co.'s Appeal*, supra, 69 Conn. 592–94, 597; see also *Opinion of the Judges of the Supreme Court as to the Constitutionality of Soldiers' Voting Act*, 30 Conn. 591, 593 (1862) ("[t]he constitution of the state . . . embodies [the people's] *supreme original will*, in respect to the organization and perpetuation of a state government; the division and distribution of its powers; the officers by whom those powers are to be exercised; and the limitations necessary to restrain the action of each and all for the preservation of the rights, liberties and privileges of all" [emphasis in original]); *Brown* v. *O'Connell*, supra, 36 Conn. 446 ("[N]o judicial power is vested by the constitution in the General Assembly, either directly or as an incident of the legislative power, and the General Assembly cannot confer it. . . . [I]t was one of the objects which the people had in view, in framing and adopting the constitution, to divest the General Assembly of all judicial power. . . . Thus, while the entire legislative power is vested in the General Assembly, the judicial power is separated from it and vested in the courts as a separate magistracy." [Internal quotation marks omitted.]); *Bridgeport Public Library & Reading Room* v. *Burroughs Home*, 85 Conn. 309, 319, 82 A. 582 (1912) ("our [c]onstitution is to be construed as a grant and not as a limitation of power, and that the exercise of judicial power is forbidden to the legislative branch of the government, as the legislative is to the judicial"); *Adams* v. *Rubinow*, supra, 157 Conn. 154 ("[I]n [*Norwalk Street Railway Co.'s Appeal*] it was finally clearly determined that [1] the constitution represented a grant of power from the people, in whom all power originally resided, and [2] the powers granted to the General Assembly are legislative only and those granted to the judiciary are judicial only. . . . But the legislative powers granted the General Assembly are complete except as restricted by the state or federal constitution, just as the judicial powers granted the judicial department are complete except as restricted by the state or federal constitution." [Citation omitted.]); *State* v. *Clemente*, supra, 166 Conn. 513–14 (same).

well established that, although the legislature has the authority to define the powers and jurisdiction of the various courts, it may not do so in a manner contrary to that provided by the constitution. See *Brown* v. *O'Connell*, supra, 36 Conn. 446 ("no judicial power is vested by the constitution in the General Assembly, either directly or as an incident of the legislative power, and the General Assembly cannot confer it"); see also *McGovern* v. *Mitchell*, supra, 78 Conn. 551 ("each provision of a constitution must be construed in view of its relation to the whole instrument").

*Brown* v. *O'Connell*, supra, 36 Conn. 432, sheds light on the nature of authority conferred on the legislature when the constitution permits the legislature to prescribe something by law. In that case, this court was required to decide whether the legislature, which had created a "police court" pursuant to its constitutional authority over the lower courts, could delegate its constitutional authority to appoint judges to a municipal body. Id., 447. The court noted that, if no provision for judicial appointment had been set forth in the constitution, then the legislature would have been free to define the procedures by which such appointment could be made. Id. The court explained that article fifth, § 3, of the 1818 state constitution, however, expressly provided that "[t]he judges of the Supreme Court of Errors, of the superior and inferior courts, and all justices of the peace, *shall be appointed by the General Assembly, in such manner as shall by law be prescribed.*" (Emphasis added; internal quotation marks omitted.) Id. The court considered whether the constitutional phrase "in such manner as shall by law be prescribed" allowed the legislature to delegate its judicial appointment authority by statute. Id. Noting that the provision required an appointment "by the General Assembly," the court held that an appointment by a municipal body in a manner "as shall by law be prescribed" was not equivalent to

an appointment by the General Assembly because, if the General Assembly could delegate its authority to another body, the words "by the General Assembly" would be rendered superfluous. (Internal quotation marks omitted.) Id., 447–48. Consequently, this court held that the legislature could not invest in another body the authority constitutionally granted to it simply because the constitution allowed it to prescribe by law the manner of exercising that authority. Id., 448.

Therefore, when the constitution expressly provides a specific grant of power to be used under particular circumstances, the mere presence of the words "as prescribed by law" does not empower the legislature to override that express grant of power. As this court long ago aptly put it: "The constitution of [this] state, framed by a convention elected for that purpose and adopted by the people, embodies their *supreme original will*, in respect to the organization and perpetuation of a state government; the division and distribution of its powers; the officers by whom those powers are to be exercised; and the limitations necessary to restrain the action of each and all for the preservation of the rights, liberties and privileges of all; and is therefore the supreme and paramount law, to which the legislative, as well as every other branch of the government, and every officer in the performance of his duties, must conform." (Emphasis in original.) *Opinion of the Judges of the Supreme Court as to Constitutionality of Soldiers' Voting Act*, 30 Conn. 591, 593 (1862). The fundamental principles of our constitution that divide governmental power, vest in each department authority over its sphere of power and authorize the exercise of those powers by particular government officials cannot be regarded merely as half-formed thoughts.

In the present case, the constitution limits the grant of judicial power that may be exercised by state referees to the power of the Superior Court. Those words exist

for a purpose, as a limitation on the grant of authority to individuals who heretofore never had been invested with that authority, and the legislature is not at liberty to disregard them. As this court long ago aptly put it, "no dicta of judges, no doubtful or improper legislation, can alter the plain fact that in 1818 the people, in the exercise of their sovereignty, granted to the General Assembly then constituted the legislative power, and forbade their exercise of other than legislative power (unless specially granted) . . . . The unequivocal mandate therein contained, that the powers delegated or granted by the sovereign, the people, through the [c]onstitution, shall be divided into three distinct departments, and those belonging to each confided to a separate magistracy . . . is binding upon this court at all times. These mandates are the voice of the sovereign speaking ever with a present authority from which there is no escape." *Norwalk Street Railway Co.'s Appeal,* supra, 69 Conn. 592. To suppose that the legislature may ignore the constitution's command and expand the grant of power to encompass any and all *judicial* authority not only would render the specific grant of authority to state referees superfluous but would exceed the legislature's authority vested by the constitution. In light of the express grant of power to state referees that notably fails to include the powers of the Supreme Court, the legislature is not free to confer that which the constitution withholds.[20]

[20] I am mindful that a decision that § 51-198 (c) is unconstitutional ultimately may call into question the ability of state referees to sit on the Appellate Court and therefore could impact judicial efficiency. Nonetheless, to allow this consideration to influence the outcome in the present case would be improper. In the first instance, the question of whether state referees may exercise Appellate Court powers on new cases referred to them in that capacity is not before this court. Second, as I previously have noted, the Appellate Court was established by constitutional amendment in 1982, long after the 1965 amendment had been adopted to grant state referees the authority to exercise the power of the Superior Court. Conn. Const., amend. XX, § 1. Consequently, interpreting the meaning of the 1965 amendment in light of an amendment that did not exist until 1982 is specious at

Finally, although I do not doubt that it is constitutional for Superior Court judges to sit by designation on the Supreme Court, as authorized by statute; see General Statutes § 51-207 (b); that grant of authority cannot invest *state referees* with similar powers merely by virtue of the fact that state referees constitutionally

best, as it is impossible for the 1982 amendment to have been contemplated in 1965.

Moreover, even if this court were to consider the question of whether state referees may exercise the powers of the Appellate Court, there are different considerations that come into play. The history of the amendment establishing the Appellate Court indicates that the legislature created that court as an intermediate reviewing court with the power to hear appeals from the Superior Court to relieve the Supreme Court of the excessively large number of appeals that impeded efficient dispute resolution. 24 H.R. Proc., Pt. 12, 1981 Sess., p. 3967; 24 H.R. Proc., Pt. 23, 1981 Sess., p. 7758. Notably, the legislature contemplated the possibility of establishing a rotation of Superior Court judges to fill the Appellate Court, similar to what had been done under the existing practice of rotating Superior Court judges through its Appellate Session, and the legislature did not appear to envision a distinction between Superior and Appellate Court judges. 24 H.R. Proc., Pt. 23, 1981 Sess., pp. 7758–59. This conclusion is buttressed by the text of General Statutes § 51-197c, which defines the Appellate Court and statutorily recognizes that Superior Court judges are qualified to serve on the Appellate Court. In contrast, § 51-198, which defines the Supreme Court, does not qualify Superior Court judges to serve on the Supreme Court, although other statutes permit Superior Court judges to serve in the event of a disqualification or the absence of a justice. See, e.g., General Statutes § 51-207 (b).

Finally, there is authority that suggests that the grant of authority to state referees in 1965, although limited to the powers of the Superior Court and the Court of Common Pleas; see footnote 3 of this dissenting opinion; actually encompassed, in effect, the entire judicial power of the state, *except* that of the Supreme Court as the court of last resort on matters of law. See *Styles* v. *Tyler*, supra, 64 Conn. 449–50 ("[t]he whole judicial power of the [s]tate is vested in the courts; that power is fully granted and is subject to no limitations except those contained in the [c]onstitution itself; inferior courts may be from time to time ordained and established by the legislature in accordance with the public needs as developed by future changes; and inferior courts are courts inferior to the Superior Court, exercising portions of that jurisdiction vested in the Superior Court, subject to such apportionment"). As such, it may be constitutionally permissible for state referees to exercise the powers of the Appellate Court because that court is not a court of last resort on matters of law. This issue, however, is not the one before the court in the present case.

may exercise the powers of the Superior Court. This court repeatedly has held that state referees are not, in fact, judges of the Superior Court, and their powers are not coincident with such judges. *Florida Hill Road Corp.* v. *Commissioner of Agriculture*, 164 Conn. 360, 363, 321 A.2d 856 (1973). Indeed, this court has emphasized that the authority vested in state referees is sui generis, and that they sit as a special tribunal exercising authority only as prescribed to them pursuant to the constitution and relevant enabling statutes. *Monroe* v. *Monroe*, 177 Conn. 173, 178–79, 413 A.2d 819, cert. denied, 444 U.S. 801, 100 S. Ct. 20, 62 L. Ed. 2d 14 (1979). Consequently, the statutory grant of authority in § 51-207 (b) to Superior Court judges, who are, after all, judicial officers invested with judicial power, to exercise powers of the Supreme Court is not sufficient to sanction the exercise of that power by state referees.

In summary, I regretfully am compelled to conclude that, *whatever* laudable motivations existed behind the enactment of § 51-198 (c), the constitution simply does not permit a Supreme Court justice who has attained the age of seventy to deliberate and participate on cases simply because that case was heard prior to his or her seventieth birthday. Although duly enacted statutes enjoy a strong presumption of constitutionality, carrying with them the imprimatur of both the legislative and executive branches; *Kerrigan* v. *Commissioner of Public Health*, supra, 289 Conn. 155; this presumption is only the beginning of our inquiry, not the end. As has been recognized since 1803, it is "emphatically the province and duty of the judicial department to say what the law is"; *Marbury* v. *Madison*, supra, 5 U.S. 177; and it would be wholly improper for this court to rest on the interpretation of other branches of government when called upon to execute that duty.

Notwithstanding the majority's assertions to the contrary, our case law consistently has held that judges

who no longer hold office may not perform judicial acts, and there can be no question that the acts of deliberating and participating in cases to decide their legal outcome are judicial acts. When a justice of the Supreme Court deliberates and participates in cases to be decided, he necessarily exercises the power of the Supreme Court because those actions constitute the very essence of judicial power—the signature judicial act of rendering judgment to resolve disputes brought to the judicial branch. That power can be vested only in a Supreme Court justice, not in a state referee, and when that justice leaves office, that power is divested from him or her and may not be restored by legislative fiat. While judges who have reached the age of seventy may exercise limited judicial power on cases referred to them in their capacity as state referees, their exercise of that authority must comport with the grant of power afforded them under the constitution. That grant does not include the powers of the Supreme Court but is limited to the powers of the Superior Court, powers which are separate and distinct from those exercised by the Supreme Court, divided intentionally in 1818.

In closing, judicial power may not be vested in one who is not permitted by the constitution to wield it, not even with the best of intentions and not even to a former Supreme Court justice.

Accordingly, I respectfully dissent.

ZARELLA, J., dissenting. I agree with much of Justice Katz' thorough dissenting opinion. I write separately, however, to highlight those portions of that opinion with which I am in agreement and to add certain key points that ultimately lead me to conclude that General Statutes § 51-198 (c)[1] is unconstitutional. In my view,

---

[1] General Statutes § 51-198 (c) provides: "A judge of the Supreme Court who has attained the age of seventy years may continue to deliberate and participate in all matters concerning the disposition of any case which the judge heard prior to attaining said age, until such time as the decision in

§ 51-198 (c), although well intentioned, fails constitutional scrutiny because it purports to grant judicial powers[2] to persons who are explicitly prohibited by our constitution from exercising them.

Article fifth, § 6, of the Connecticut constitution, as amended by article eight, § 2, of the amendments, provides in relevant part that "[n]o judge shall be eligible to hold his office after he shall arrive at the age of seventy years . . . ." This prohibition has been part of our constitution from the dawn of its adoption in 1818. See Conn. Const. (1818), art. V, § 3.[3] Since that time, our case law consistently has held that a judge who no longer holds his office is prohibited from exercising judicial powers but may perform clerical acts. Compare *DeLucia* v. *Home Owners' Loan Corp.*, 130 Conn. 467, 471–72, 35 A.2d 868 (1944) (holding that municipal judge who ceased to hold office lacked judicial power to issue order granting extension of time to appeal, which "is clearly a judicial and not a clerical act"), and *Griffing* v. *Danbury*, 41 Conn. 96 (1874) (holding that judge who resigned had no power to grant motion for new trial in case tried before him prior to resignation), with *Todd* v. *Bradley*, 97 Conn. 563, 566–68, 117 A. 808 (1922) (holding that judge who no longer held office after reaching age of seventy may perform " 'clerical' " act of making findings for purposes of facilitating perfection of appeal), and *Johnson* v. *Higgins*, 53 Conn. 236, 237–39, 1 A. 616 (1885) (holding that judge who resigned may perform "clerical" act of articulating findings in

any such case is officially released. The judge may also participate in the deliberation of a motion for reconsideration in such case if such motion is filed within ten days of the official release of such decision."

[2] It cannot be disputed that the deliberation and opinion preparation process, which necessarily requires "judicial discretion," is a judicial act. *DeLucia* v. *Home Owners' Loan Corp.*, 130 Conn. 467, 472, 35 A.2d 868 (1944).

[3] Article fifth, § 3, of the Connecticut constitution of 1818 provides in relevant part: "No judge or justice of the peace shall be capable of holding his office, after he shall have arrived to the age of seventy years."

case tried to him in which judgment was rendered before resignation).

The 1965 state constitution created one exception to this prohibition. This exception permits a judge who is not "eligible to hold his office after he shall arrive at the age of seventy years" to nonetheless exercise "the powers of the superior court . . . on matters referred to him as a state referee." Conn. Const., art. V, § 6. This exception is significant for two reasons. First, the fact that this exception was necessary to empower judges who have reached the age of seventy years to exercise judicial power underscores the fact that, without such an exception, the exercise of such power is prohibited. Statements made at the 1965 constitutional convention[4] illustrate this point and demonstrate that the drafters understood the exception to be a change in the powers that state referees could exercise. Under the 1965 constitution, state referees could perform judicial acts in matters referred to them, whereas their powers previously were limited to finding facts and making reports to the referring court. See *Harbor Construction Corp.* v. *D. V. Frione & Co.*, 158 Conn. 14, 16, 255 A.2d 823 (1969); see also *State* v. *Miranda*, 274 Conn. 727, 744, 878 A.2d 1118 (2005) (*Borden, J.,* concurring) (discussing 1965 constitutional convention and indicating that, prior to adoption of article fifth, § 6, in 1965, powers of state referees were limited to finding facts). Second, because the exception is limited in that it confers

---

[4] At the constitutional convention in 1965, former Connecticut Supreme Court Justice Abraham S. Bordon stated: "At the present time, a retired judge becomes a [s]tate [r]eferee. . . . A [s]tate [r]eferee has no right or power to enter a judgment after he decides the case; he may only make a recommendation to the Superior or the Common Pleas Court, which recommendation may or may not be adopted . . . . The matter has to then be referred back to the court for the passage of an order that may be important or necessary for the continuance of the case." Constitutional Committee Hearings, Resolutions and Rules of the 1965 Connecticut Constitutional Convention (August 24, 1965) p. 35.

on state referees only "the powers of the *superior court*"; (emphasis added) Conn. Const., art. V, § 6; it follows that no other powers, including the powers of the Supreme Court, may be exercised by any judges who have reached the age of seventy years, including former Supreme Court justices. Stated another way, the inclusion of the singular exception to the general rule strongly suggests that it is to the exclusion of any other exceptions.[5] Thus, apart from the sole exception contained in article fifth, § 6, which this court unanimously agrees is inapplicable to the present case,[6] the constitution grants no authority to the legislature to enact laws that permit judges who are seventy years or older to engage in judicial acts.

Our constitution is "construed as a grant and not as a limitation of power . . . ." *Bridgeport Public Library & Reading Room* v. *Burroughs Home*, 85 Conn. 309, 319, 82 A. 582 (1912). Accordingly, the legislature may exercise only those powers granted to it by the constitution. See, e.g., *Norwalk Street Railway Co.'s Appeal*, 69 Conn. 576, 592, 37 A. 1080 (1897). Although article third, § 1,[7] confers legislative power on the General Assembly, such power is limited by article fifth of

---

[5] Article fifth, § 6, of the Connecticut constitution expressly permits state referees to exercise "the powers of the superior court or court of common pleas . . . ." That provision, however, is notably silent with respect to the powers of the *Supreme Court*. "[W]hen the items expressed are members of an associated group or series," we may invoke the canon of statutory construction known as expressio unius est exclusio alterius—the expression of one thing is the exclusion of another—and infer that the item not mentioned—namely, the powers of the Supreme Court—was "excluded by deliberate choice." (Internal quotation marks omitted.) *Sastrom* v. *Psychiatric Security Review Board*, 291 Conn. 307, 319 n.15, 968 A.2d 396 (2009).

[6] See footnote 8 of the majority opinion; see also part II of Justice Katz' dissenting opinion.

[7] Article third, § 1, of the Connecticut constitution provides in relevant part: "The legislative power of this state shall be vested in two distinct houses or branches; the one to be styled the senate, the other the house of representatives, and both together the general assembly. . . ."

the constitution with respect to legislation concerning the judicial branch.[8] Because article fifth, § 6, explicitly limits the legislature's authority to delegate judicial power to judges who are seventy years or older, I conclude that the legislature was without constitutional authority to enact § 51-198 (c). Therefore, in my view, the statute is unconstitutional.

Even though the majority concedes that § 51-198 (c) does not fall within the sole exception to the constitutional limitation contained in article fifth, § 6, it nonetheless concludes that § 51-198 (c) is constitutional because, in its view, Supreme Court justices who are seventy years of age or older may engage in the judicial acts contemplated by the statute without "holding office . . . ." I find the majority's analysis and support for its conclusion to be flawed and untenable, and, therefore, I disagree with its conclusion.

The dispositive issue in the present case is whether the constitution grants the legislature the power to delegate judicial power to judges who are constitutionally ineligible to hold office because they have reached the age of seventy. The majority skirts this issue, however, and, instead, frames the issue as whether such a judge who engages in the acts authorized by § 51-198 (c) is "hold[ing] his office" within the meaning of article fifth, § 6. (Internal quotation marks omitted.) These issues are not synonymous, and a determination of the latter does not resolve the former. There is no dispute that a Supreme Court justice, upon turning seventy, no longer is permitted, by virtue of article fifth, § 6, to hold

---

[8] See *Brown* v. *O'Connell*, 36 Conn. 432, 446 (1870) ("the General Assembly [has] no power or authority to organize courts, or appoint judges, by virtue of the general legislative power conferred [on it], and . . . [its] authority to do either is special, and derived from [article fifth] of the constitution [of 1818] alone; and . . . the judicial power is not conferred by the General Assembly, but vests, by force of the constitution, in the courts, when organized pursuant to the special provisions of that article").

his or her office; the text of the constitution clearly states as much. Yet, much of the majority's opinion is dedicated to deciding this nonissue. What the majority fails to do, however, is identify any authority or provide any analysis in support of its assertion that the legislature may vest individuals who do not hold judicial office with the power to perform judicial acts.

Similarly, the majority has failed to identify the constitutional source of authority that permits the legislature to enact § 51-198 (c). Instead, the majority appears to assume that such unidentified authority exists *somewhere* in the constitution because "similar" legislation concerning justices of the peace and Superior Court judges has been a part of our law since the 1800s and has "resulted in few challenges and little controversy." In my view, the lack of case law and robustly contested litigation in an area is hardly justification for declaring the constitutionality of a statute, especially in the present case, in which the "few challenges" on record do not reach the issue presented in this case.

Among the "few challenges" that are relevant to this litigation are *Johnson* v. *Higgins*, supra, 53 Conn. 236, and *Todd* v. *Bradley*, supra, 97 Conn. 563, both of which concerned the constitutionality of various incarnations of what is now General Statutes § 51-183g.[9] In *Johnson*, the court held that the legislature constitutionally may empower a judge who has resigned from his office to perform the "clerical" act of articulating findings in a case that was tried to him prior to his resignation. *Johnson* v. *Higgins*, supra, 237–38. In *Todd*, the court extended this holding to include judges who are no longer constitutionally permitted to hold their offices

---

[9] General Statutes § 51-183g provides: "Any judge of the Superior Court may, after ceasing to hold office as such judge, settle and dispose of all matters relating to appeal cases, as well as any other unfinished matters pertaining to causes theretofore tried by him, as if he were still such judge."

after reaching the age of seventy. See *Todd* v. *Bradley*, supra, 566–68.

Notably, neither *Johnson* nor *Todd* presented the court with the issue of whether a judge could validly perform a *judicial* act after leaving office. Consequently, it is not surprising that these cases have resulted in what the majority refers to as "little controversy." Indeed, the court in *Johnson* commented that the act of the judge that was challenged, namely, "[t]he signing of the finding and statement . . . [was] so far from being an illegal act that it may admit of serious question whether, even without the enabling legislation . . . the judge would . . . have [had] the power . . . to complete [such act] without reference to his term of office." *Johnson* v. *Higgins*, supra, 53 Conn. 238.

Even though the court in *Johnson* and *Todd* never was presented with the issue of whether the legislature could constitutionally empower a former judge to perform a judicial act, the majority nonetheless interprets these cases as if they authoritatively resolve this issue. In support of this broad interpretation, the majority relies on an odd mixture of hypothetical dicta, acquiescence and the apparent failure of the plaintiff in *Johnson* to adequately brief the constitutionality of the statute at issue.[10] In my view, the constitutionality of a statute cannot be based on such hollow and tenuous grounds. The majority, however, is left with little else to justify its broad interpretation of these cases, and, without such interpretation, the majority lacks binding

---

[10] Specifically, the majority refers to the following language in *Johnson* to support its interpretation: "*Even if* it be admitted that the act of the judge in signing the finding on appeal is a judicial act in the sense claimed by the plaintiff . . . *no authority has been brought to our attention* denying the legislature the power implied in the law in question. Similar legislation, and of more embracing scope, *has for many years been operative, unchallenged*, in reference to the judicial power of justices of the peace." (Emphasis added.) *Johnson* v. *Higgins*, supra, 53 Conn. 237.

legal support for its conclusion that § 51-198 (c) is constitutional.

I cannot subscribe to the majority's strained interpretation of *Johnson* and *Todd*. In my view, the better reading of these cases is that they stand for the quite unremarkable proposition that retired judges have the power to perform nonjudicial functions. Under such an interpretation, § 51-183g would be adjudged constitutional only as it relates to the performance of clerical rather than judicial acts.[11] Because I cannot take the same leap as the majority in interpreting *Johnson* and *Todd*, I must agree with Justice Katz that there is no case law from our jurisdiction and no provision of our constitution that supports the majority's conclusion that a judge who no longer holds his or her office may continue to perform judicial acts.

Accordingly, I respectfully dissent.

---

[11] One major difference between §§ 51-183g and 51-198 (c) is that the acts described in § 51-183g are couched in general terms and could, but might not, encompass judicial acts; see footnote 9 of this opinion; whereas § 51-198 (c) unequivocally describes acts that include judicial acts. See footnotes 1 and 2 of this opinion.

